2004 VT 21

# In re Bernard Carter

[848 A.2d 281]

Nos. 01-502 & 01-526

Present: Amestoy, C.J., Dooley, Morse,[1] Johnson and Skoglund, JJ.

Opinion Filed February 27, 2004

---

[1] Justice Morse sat for oral argument but did not participate in this decision.

*Bradley S. Stetler* of *Stetler, Allen & Kampmann, Burlington,* for Petitioner-Appellee (01-502) Petitioner-Appellant (01-526).

*William H. Sorrell,* Attorney General, and *David Tartter,* Assistant Attorney General, Montpelier, for Respondent-Appellant (01-502) Respondent-Appellee (01-526).

¶ 1. **Dooley, J.** This case involves challenges to two summary judgment rulings made on a petition for post-conviction relief from a conviction of aggravated sexual assault under 13 V.S.A. § 3253 and the resulting sentence. Petitioner appeals the denial of his June 1, 1998 motion for summary judgment, arguing that the trial court erred in not finding that: (1) the information failed to state the essential elements of the crime of sexual assault; (2) the information and jury instructions omitted the requirement that serious bodily injury under 13 V.S.A. § 3253(a)(6) must be "imminent"; and (3) the information and jury instructions did not ensure that the jury was unanimous in its determination to which victim the threat of serious bodily injury was directed. The State appeals the trial court's decision to grant petitioner's September 21, 1999 motion for summary judgment because petitioner was interviewed for the presentence report without the presence of his lawyer. The State argues that: (1) petitioner failed to demonstrate that he did not deliberately bypass a direct appeal of his claim; (2) his Sixth Amendment rights were not violated by the presentence investigation interview; and (3) his Fifth Amendment rights similarly were not violated by the presentence investigation interview. We affirm both summary judgment rulings.

¶ 2. Petitioner was charged with committing aggravated sexual assault on a former girlfriend. At trial, petitioner testified in his own defense, claiming that the sex was consensual. The jury returned a verdict of guilty on a single count of aggravated assault under 13

V.S.A. § 3253(a)(6). On appeal, petitioner argued that the trial court erred in admitting evidence of his flight to avoid prosecution, but excluding petitioner's explanation of why he left; in admitting evidence of the victim's statement to her sister as a prior consistent statement; and in admitting evidence that petitioner failed to deny the crime to the police when arrested. We found that the first two arguments were valid, but the admission of the evidence was harmless, and rejected the third argument. See *State v. Carter*, 164 Vt. 545, 674 A.2d 1258 (1996). The conviction was affirmed.

¶ 3. On April 15, 1997, petitioner filed a petition for post-conviction relief with the superior court, raising five claims: (1) the information failed to state an offense because it did not detail the essential elements of the crime of sexual assault; (2) the information and the jury instructions omitted the requirement that serious bodily injury be "imminent"; (3) the information and jury instructions did not ensure that the jury was unanimous in its determination of to whom the threat of serious bodily injury was directed; (4) the presentence report interview violated petitioner's Fifth and Sixth Amendment rights; and (5) the sentence was disproportionate to the offense.

¶ 4. On June 1, 1998, petitioner moved for summary judgment on the first three of these claims. The court denied this motion on January 20, 1999. Thereafter, petitioner amended his petition to allege additionally that the reliance in sentencing on his failure to acknowledge responsibility for the crime, without offering him immunity, violated his Fifth Amendment rights. On September 21, 1999, petitioner moved for summary judgment on his added claim and on his fourth claim — that the presentence interview, conducted in the absence of counsel, violated his Fifth and Sixth Amendments rights. On November 13, 2001, the superior court granted this motion on Sixth Amendment grounds, vacated the sentence and final judgment of the district court, and remanded the matter for further proceedings.

¶ 5. On November 15, 2001, the State filed an appeal of the summary judgment vacating the sentence. On December 3, 2001, petitioner filed an appeal of the court's denial of the summary judgment motion on the first three claims. These appeals were consolidated on May 3, 2002.

¶ 6. The appeals address rulings on motions for summary judgment. In ruling on a denial or grant of summary judgment, this Court applies the same standard as the trial court. *Sabia v. Neville*, 165 Vt. 515, 523, 687 A.2d 469, 474 (1996). Summary judgment is appropriate when there are no genuine issues of material fact and, viewing the evidence

in a light most favorable to the nonmoving party, the moving party is entitled to judgment as a matter of law. *Id.*

## I.

¶ 7. We first address the State's argument with respect to both summary judgment decisions that the superior court should not have reached the merits of the post-conviction claims because petitioner failed to demonstrate that he did not deliberately bypass the issues on direct appeal. The State raised this issue below with respect to petitioner's second summary judgment motion that the sentence was tainted by the constitutional violations in the presentence interview. The trial judge ruled that deliberate bypass did not apply to an issue not raised either at trial or on direct appeal. Although the State failed to contest the first summary judgment motion on this ground, the trial judge's rationale on the second motion would also apply to the first: none of the issues covered in that motion were raised in the district court or on direct appeal.

¶ 8. The State relies primarily on *In re Hart*, 167 Vt. 630, 631, 715 A.2d 640, 641 (1998) (mem.), which held that petitioner in a post-conviction relief proceeding under 13 V.S.A. § 7131 has the burden of proving that he did not deliberately bypass raising the issues in the petition on direct appeal from the conviction and sentence. Although *Hart* specified the burden of proof with respect to deliberate bypass, it did not describe the elements of deliberate bypass because petitioner did not deny that deliberate bypass applied in that case. See *id.* To find the elements of deliberate bypass we must look to earlier decisions.

■ ¶ 9. Under Vermont's post-conviction relief statute, 13 V.S.A. §§ 7131-7137, a prisoner may bring a challenge to confinement where the sentence is subject to collateral attack. *State v. Cooley*, 135 Vt. 409, 411, 377 A.2d 1386, 1387 (1977). However, post-conviction review is not a substitute for direct appeal. *In re Nash*, 149 Vt. 63, 64, 539 A.2d 989, 990 (1987); *Berard v. Moeykens*, 132 Vt. 597, 600, 326 A.2d 166, 168 (1974). The prohibition on deliberate bypass arises from this principle. See *In re Stewart*, 140 Vt. 351, 361, 438 A.2d 1106, 1110 (1981). The prohibition was described in *Nash*:

Where the issues raised in a petition for post-conviction relief were contested at trial and were not raised on direct appeal, they will not be addressed on post-conviction review unless it is demonstrated that the failure to raise them on direct appeal was inadvertent, that appellate counsel was ineffective,

or that extraordinary circumstances excused the failure to raise the issues on appeal.

149 Vt. at 64, 539 A.2d at 990. In *Nash* and other cases in which we dismissed a post-conviction relief proceeding because of waiver or deliberate bypass, see *Hart*, 167 Vt. at 630 n.1, 715 A.2d at 641 n.1 (terms "deliberate bypass" and "inadvertent waiver" implicate the same general principle), the issues involved were preserved for appeal in the criminal court, but not appealed. See *Ladabouche v. Walton*, 152 Vt. 224, 226, 565 A.2d 1324, 1325 (1989) (in post-conviction relief proceeding, petitioner challenged failure to strike testimony in response to his motion; issue not raised in the direct appeal); *Nash*, 149 Vt. at 64, 539 A.2d at 990 (issues "were preserved at trial but not raised on his direct appeal"); *Berard*, 132 Vt. at 600, 326 A.2d at 168 (issue in petition "was presented, argued at length, and granted in large part" in district court).

¶ 10. Here, none of the issues presented in the post-conviction relief petition were raised or adjudicated in the district court. Under *Nash*, deliberate bypass does not apply. Thus, we reach the merits of the two summary judgment decisions, beginning with the summary judgment decision rejecting challenges to the conviction because of defects in the charging information or in the instructions to the jury.[2]

## II.

¶ 11. Petitioner first argues that the court erred in rejecting his challenge to the information, alleging it failed to adequately charge the offense for which he was convicted. As stated in our discussion of deliberate bypass, petitioner did not raise this issue in the district court.

---

[2] The State argues that we should not reach the merits of the denial of petitioner's summary judgment motion because a decision denying summary judgment is not a final judgment. See *Morrisville Lumber Co. v. Okcuoglu*, 148 Vt. 180, 182, 531 A.2d 887, 888 (1987). For purposes of petitioner's challenge to his conviction, the record in the superior court consists only of the record of the district court criminal case. There are no material facts in dispute. Thus, in denying summary judgment for petitioner on these challenges, the superior court should have rendered summary judgment for the State. See V.R.C.P. 56(c)(3). We conclude that the second summary judgment decision impliedly did so because it vacated the sentence but not the conviction, granting all the relief it intended to. At that point, the court rendered a final judgment against petitioner on his challenges to his conviction. We treat the first summary judgment decision as granting summary judgment against petitioner and conclude that it is properly before us.

¶ 12. Petitioner was charged with aggravated sexual assault, which includes as an element "sexual assault." See 13 V.S.A. § 3253(a). Under 13 V.S.A. § 3252(a) sexual assault may be shown under any of four specifications of elements. Petitioner argues that the information was defective because it failed to specify which of the four definitions of sexual assault was charged and failed to specify the elements of the definition charged, including the implied mental element. According to petitioner, these omissions were prejudicial because he was not given sufficient notice of the State's theory of the case to prepare a defense.

¶ 13. V.R.Cr.P. 7(b) provides that the information "shall be a plain, concise, and definite written statement of the essential facts constituting the offense charged." This rule ensures that a criminal defendant is provided with sufficient notice to enable the preparation of an effective defense. See *State v. Brown*, 153 Vt. 263, 272, 571 A.2d 643, 648 (1989). In providing this notice, the information does not stand alone; it must be read in conjunction with the accompanying affidavit of probable cause in determining its sufficiency. *Id.* at 272-73, 571 A.2d at 648. Where elements of the offense are based on other statutory sections, "it is not necessary that the State detail all those obligations in the information where the defendants have sufficient notice of the charges to form a defense." *State v. DeLaBruere*, 154 Vt. 237, 277, 577 A.2d 254, 276 (1990); see also *State v. Francis*, 151 Vt. 296, 309, 561 A.2d 392, 399-400 (1989) (requirement that the information specify express statutory elements does not apply to elements incorporated by reference from another statute).

¶ 14. In reading the information in conjunction with the accompanying affidavits authored by two police officers and filed by the State, it is clear that the petitioner was given notice of the "omissions" which he alleges. The affidavit describes in detail petitioner's alleged forcible rape of the victim, leaving no doubt that the State was proceeding under § 3252(a)(1) (compelling another person to participate in a sexual act),[3] and specifically addressing the sexual act and the element of compulsion of that subsection. The account of the rape given by the victim and included in the affidavit recounts petitioner's various statements manifesting his intent to sexually assault her, made

---

[3] The other subsections involve situations in which the other person has been drugged or intoxicated, or is under the age of sixteen, or is under the age of eighteen and has been entrusted to the actor's care. 13 V.S.A. § 3252(a)(2)-(4). The affidavit indicates that the victim was twenty years old at the time of the offense, and it contains no mention of petitioner drugging or otherwise administering intoxicants to the victim.

while holding a knife to her throat. These details provided petitioner with ample indication of the intent and imminence that the State would seek to prove.

¶ 15. Petitioner particularly faults the failure to specify the implied mental element the State had to prove. We have held, however, that in the absence of an objection, failure to include the mental element of an offense in the information is not reversible error where the statute does not explicitly state that element. See *State v. Roy*, 151 Vt. 17, 29, 557 A.2d 884, 891-92 (1989); see also *State v. Conn*, 152 Vt. 99, 105, 565 A.2d 246, 249 (1989); *State v. Gabert*, 152 Vt. 83, 88, 564 A.2d 1356, 1359 (1989) ("[I]t would be hypertechnical to insist that courts explain an implicit mental element that is established by inferences drawn from the acts of the defendant, especially when the defendant's acts do not lead to equivocal inferences of his mental state.").

¶ 16. In any event, a petitioner in a post-conviction proceeding must do more than demonstrate that the information was insufficient; he must also demonstrate that he was prejudiced by the insufficiency. See *In re Stevens*, 146 Vt. 6, 9, 497 A.2d 744, 747 (1985). Petitioner here has done little to demonstrate prejudice beyond stating that the defense lacked notice as to the State's theory. Except for the alleged "omission" of intent, petitioner has suggested no way in which the defense would have been different in the absence of the alleged omissions. See *State v. Hurley*, 150 Vt. 165, 171, 552 A.2d 382, 386 (1988) (defendant cannot complain of failure of information to spell out mens rea component because he "failed to show how the preparation or presentation of his defense was in any significant way hampered by this omission"). Without such a showing of prejudice, there is no error.

¶ 17. As to the intent element, petitioner claims that this "omission" "prevented the defense from properly developing the link between [petitioner's] intoxication [at the time of the offense] and his mental state." We cannot see how petitioner was so prevented. Petitioner raised this issue for the first time in the post-conviction relief proceedings. Throughout the original trial, he defended on the grounds that the victim consented to the sexual relations, without ever suggesting that his intoxicated state impaired his judgment. The intent element was specifically included in the instructions to the jury, without objection by petitioner. As we stated in *Hurley*:

> [T]he trial proceeded on the basis of a crime involving crimi-
> nal intent, and the proof conformed. In such a case, with the
> issue raised only on appeal, the defendant has no grounds to
> complain of a failure of the information to spell out a mens
> rea component.

*Id.* Petitioner's claim that he was somehow precluded from presenting a diminished capacity defense must be rejected. See *State v. Kinney*, 171 Vt. 239, 244, 762 A.2d 833, 838-39 (2000) (failure to instruct jury on diminished capacity due to intoxication was harmless error where defendant testified that victim voluntarily engaged in sexual relations with him and there was no testimony to suggest that he was so impaired that he could not have requisite criminal intent).

¶ 18. Petitioner next argues that the information and the jury in-structions were faulty because they omitted the requirement that serious bodily injury under 13 V.S.A. § 3253(a)(6) be imminent. Although the information pled in the alternative, the State finally focused its case on a violation of § 3253(a)(6), which provides:

> (6) At the time of the sexual assault, the actor threatens to
> cause imminent serious bodily injury to the victim or to an-
> other and the victim reasonably believes that the actor has
> the present ability to carry out the threat.

The information left out the word "imminent" from the statutory language, and on two occasions the court read the information to the jury. As with other claimed errors, petitioner never objected in the district court to either the language of the information or the charge to the jury.

¶ 19. We recognize that the omission of statutory language contain-ing an element of the offense represents a more serious error, but here the error was entirely technical. The information cited the statutory section petitioner was charged with violating. The affidavit made clear that the State alleged imminent serious bodily harm, and the peti-tioner cannot show any prejudice from the omission of the language. See *Stevens*, 146 Vt. at 9, 497 A.2d at 747 (requiring a showing of prejudice).

■ ¶ 20. Petitioner's argument fares no better when directed at the jury instructions. The argument is based solely on instances when the trial court read the information to the jury; as the information did not contain the imminence element, neither did these readings. Immedi-ately following both readings of the information, the trial court clearly

instructed the jury that serious bodily injury must be imminent. Further, the court's explanations of other elements included the imminence requirement, as did the jury verdict form.

¶ 21. Since petitioner failed to object to the jury instructions, he must show plain error. Plain errors are "defects affecting substantial rights ... not brought to the attention of the [trial] court." V.R.Cr.P. 52(b). Such error exists "only in exceptional circumstances where a failure to recognize error would result in a miscarriage of justice, or where there is glaring error so grave and serious that it strikes at the very heart of the defendant's constitutional rights." *State v. Hoadley*, 147 Vt. 49, 53, 512 A.2d 879, 881 (1986). In order for a defect to rise to the level of plain error, the alleged error must not only seriously affect substantial rights, but it must also have an unfair prejudicial impact on the jury's deliberations. *State v. Pelican*, 160 Vt. 536, 538-39, 632 A.2d 24, 26 (1993). "Prejudice must exist to demonstrate that error undermined fairness and contributed to a miscarriage of justice." *Id.* at 539, 632 A.2d at 26. In assessing plain error with respect to jury instructions, we view them in their entirety. See *id.*

¶ 22. This case is controlled by *State v. Forant*, 168 Vt. 217, 220, 719 A.2d 399, 401 (1998), in which the jury instructions misstated the burden of proof on self-defense on one occasion, but correctly stated it on others, and petitioner failed to object to the instructions. Noting that the jury did not ask for clarification and that the error was not obvious, we found no plain error. *Id.*; see also *State v. Streich*, 163 Vt. 331, 353, 658 A.2d 38, 53 (1995) (no plain error where two isolated phrases in lengthy jury charge were erroneous but court repeatedly gave the correct instruction). Taken as a whole, the jury instructions in this case provided sufficient guidance on the requirement that the serious bodily injury be imminent. See *State v. Norton*, 147 Vt. 223, 235, 514 A.2d 1053, 1061 (1986) ("If, as a whole the charge breathes the true spirit and doctrine of the law, and there is no fair ground to say that the jury has been misled by it, it ought to stand.") (internal quotations and citations omitted). There was no plain error here.

¶ 23. Finally, petitioner claims that it was plain error for the trial court to instruct the jury that the offense required threats of "serious bodily injury to the victim or to another," 13 V.S.A. § 3253(a)(6), without expressly requiring unanimity as to whom the threat was directed. Petitioner argues that the charge did not ensure unanimity on this element because the evidence showed threats both to the victim

and to her family. He argues that some of the jurors may have found that the threats to the victim satisfied the State's burden on this element while other jurors may have found that the State's burden was satisfied by the threats to the victim's family.

¶ 24. As we held explicitly in *State v. Holcomb*, 156 Vt. 251, 255, 590 A.2d 894, 896 (1991), petitioner must show that plain error resulted from the failure to ensure the jury verdict was unanimous on all elements. As with other arguments, petitioner has shown a possibility of error, but little likelihood of prejudice. To demonstrate prejudice, petitioner would need to show that it was likely that some jurors found that there were threats to the victim but not to her family while other jurors found just the opposite. In fact, evidence on both threats was inextricably intertwined; in her testimony at trial, the victim often described both threats within the same statement. The situation is very similar to *Holcomb*, in which we found no plain error:

> There was no reason for jurors to distinguish between the two alleged acts. Defendant's defense did not distinguish between the two acts, and he was not hampered in preparing a defense.

*Id.* The *Holcomb* analysis applies here.

¶ 25. Petitioner argues, however, that we are bound to follow our decision in *State v. Couture*, 146 Vt. 268, 502 A.2d 846 (1985), and that decision commands that we must grant post-conviction relief. In *Couture*, the defendant was charged in a single count with kidnapping five people. The trial court instructed the jury that they could convict the defendant if they found that he had forcibly confined "*any one of the five* alleged victims." *Id.* at 270, 502 A.2d at 848. This Court found that had the trial court required the State to prove that the defendant forcibly confined all five people, and instructed the jury to that effect, there would have been no prejudice. Instead, the trial court treated the multiple incidents of forcible confinement as a single count, thereby allowing the possibility that "not all jurors believed the defendant guilty of the same count or counts." *Id.* at 271, 502 A.2d at 849. Because the charge gave the jury multiple ways to convict the defendant without ensuring unanimity as to which person or persons the jury found had been kidnapped, there was plain error.

¶ 26. To the extent that *Couture* is read to hold that the mere possibility that the jury was not unanimous on an element of the offense because of the instructions is plain error, its holding did not survive *Holcomb*. Indeed, *Holcomb* intentionally rejected interpreting our

prior decisions suggesting that jury instruction errors that caused the possibility that the jurors were not unanimous on an element was plain error per se. 156 Vt. at 254-55, 590 A.2d at 895-96; see also *State v. Loveland*, 165 Vt. 418, 422, 684 A.2d 272, 275 (1996) (affirming Court's long-held position that it would be "bad policy to create a category of errors which are plain per se").

¶ 27. For the foregoing reasons, the trial court was correct in denying summary judgment to petitioner, and instead granting it to the State on the issues raised with respect to petitioner's conviction. We turn then to his challenge to his sentence. The issues involve the presentence report prepared by the Vermont Department of Corrections and submitted to the sentencing judge.

### III.

¶ 28. In preparation for the presentence report, petitioner was interviewed by two Vermont probation officers at the Northwest State Correctional Facility, where he had been incarcerated since his arrest. Petitioner asked the officers where his lawyer was and stated that he did not want to talk to them without his lawyer being present. One of the officers told petitioner that his lawyer did not need to be present for the interview. The officers subsequently asked him questions, and he answered them.

¶ 29. Because of the position of the dissent that the superior court erred in finding that the sentence was influenced by defendant's uncounseled statements, we describe the interview — and the probation officer's reliance upon it — in detail. During the interview, petitioner continued to deny guilt, and also made several negative statements about the complaining victim. Further, he expressed his continuing anger towards the victim and the system and his unwillingness to engage in rehabilitative treatment. Petitioner stated:

> You are going to give me a minimum of 15 to 20 or more with a max of 40 to 50. And if you do, how do you think I'll be when I get out? I'm angry now. Don't you think I'll be angrier and harder then? How would you be if this happened to you? She lied through the whole thing.
>
> I've got a lot of hate for this girl. She didn't say no, she put the rubber on me and everything. You should have seen her in court ... some show. She could turn the tears on and off.

She was over there smirking. She knows she lied. I didn't do anything.

I'm not doing no sex offender shit. I'll max my sentence. I'll do violent offender, but no sex shit.

I have a lot of hate for her and frustrated anger. I could have killed her and been looking at the same amount of time I'm facing now.

The officer quoted these statements by the petitioner in the report.

¶ 30. The officer also relied heavily on these statements in reaching his recommendation of a sentence of thirty years to life. The officer returned to these statements a number of times in his lengthy report. For example, the last paragraphs of his summary, prior to his conclusion and recommendation, stated:

If he remains in denial and continues to refuse responsibility for his actions then he will remain a serious threat to the community.

I do not feel I can emphasize that point enough. Mr. Carter has viciously and savagely attacked and sexually assaulted a member of the community. He has made threats and even plans to kill her, his girlfriend, and members of the judicial system. Of all the statements this officer has come across in this pre-sentence investigation, one of the most telling and frightening statements I noted was one Bernard Carter stated to myself and Probation and Parole Officer William Gilding.

"I have a lot of hate and frustrated anger," said Bernard Carter, "I could have killed her and been looking at the same amount of time I'm facing now."

¶ 31. He then stated his recommendation and the reasons for it:

In determining a recommendation, I go, once again to a statement given to this officer by Bernard Carter. Mr. Carter states, "You are going to give me a minimum of 15 to 20 or more, with a max of 40 to 50. And if you do, how do you think I'll be when I get out. I'm angry now. Don't you think I'll be angrier and harder then?"

This officer took that statement as a threatening warning. Bernard Carter has made several threats to kill. He has made it clear that he will be angry regardless of the amount of time he is to be sentenced and his anger will intensify

through the period of time he is incarcerated. "The minimum don't mean shit," claimed Mr. Carter. Therefore, it is respectfully recommended that the Honorable Court issue the following sentence in this case:

30 years to life.

The officer then noted that the sentence may seem lenient in view of petitioner's statement that he would maintain anger for up to fifty years, but petitioner could take advantage of the minimum only if he participated in sexual offender counseling, which would require petitioner to "let go of" his anger. The officer concluded that if petitioner maintained his anger and denial, the sentence would keep him in prison for life.

¶ 32. The probation officer was the State's sole witness at the sentencing hearing, and he testified consistent with his conclusions and recommendation, emphasizing petitioner's statements to him. Petitioner gave a statement in which he endorsed the officer's recommendation in comparison to the prosecutor's request for a harsher sentence. He did not deny responsibility for the acts for which he was convicted, instead apologizing to the victim, admitting he was convicted of "a horrendous crime" and is violent, and stating that he was sorry for the things he had done and wanted to change. The prosecutor recommended a sentence of forty-five years to life, emphasizing petitioner's denial as well as his anger and one of the statements he made to the probation officer.

¶ 33. The court accepted the prosecutor's recommendation. The judge stated explicitly that he was relying upon the presentence report, along with other record evidence. He found that petitioner "denies commission of the offense." He stated that he expressly considered "Mr. Carter's own statement and allocution." He found, among other things:

The credible evidence establishes that Mr. Carter, despite his statement today, has persisted in ideation and articulation of threats, that there remains grave risk to Darci Dimambro, to Rebecca Maniatty. There remains risk to members of the community, who may in the future be subject to the action, such as Mr. Carter stands convicted of.

He emphasized that although he articulated certain factors in reaching his sentence, these should not "be construed as a statement that we

have not considered ... each and all of the aspects of the evidence in the case that pertains to the just sentence to be given in the case."

¶ 34. Petitioner challenges the presentence interview on two grounds: (1) it and the resulting sentencing proceedings violated his right against self-incrimination under the Fifth Amendment; and (2) it was conducted in violation of his right to counsel under the Sixth Amendment. The superior court reached only the second ground and granted summary judgment for petitioner on it. The parties have briefed both grounds. Since we agree with the superior court's decision, we do not reach the Fifth Amendment argument.

¶ 35. Before we reach the merits of the legal issue presented in the appeal, we address two arguments that we should not reach the merits: the dissent's argument that the alleged error had no effect on petitioner's sentence, and the State's argument that petitioner failed to invoke his right to counsel. As to the dissent's position, the superior court concluded that the sentencing court relied upon petitioner's statement:

> The sentencing court specifically noted that it had considered these statements in determining petitioner's sentence. The pre-sentence report thus clearly influenced the duration of petitioner's sentence. ... Indeed, having a system which allows these reports, which generally carry great weight in the determination of a defendant's sentence, to be made without assistance of counsel leaves the indigent and inept at great disadvantage. For example, in exactly this kind of case, in which defendant testified at trial, the uncounseled and uneducated may believe that consistency is the highest virtue, perjury the greatest threat.

We have held generally that a post-conviction relief petitioner must show both error and prejudice arising from that error. See *In re Stevens*, 146 Vt. at 9, 497 A.2d at 747. We have not specified what is necessary to show prejudice from improper sentencing information, although our relevant decisions suggest that the burden is not high.

¶ 36. For example, in *In re Meunier*, 145 Vt. 414, 419, 491 A.2d 1019, 1023 (1985), a post-conviction relief decision, the parties entered into a plea agreement that required the prosecutor to "remain silent concerning specific sentence." The superior court found that the prosecutor violated the agreement in a sentencing argument and required a resentencing although there was no clear indication how the prosecutor's argument affected the sentence imposed. We affirmed holding

that the remedy fulfilled petitioner's reasonable expectations. *Id.* at 423, 491 A.2d at 1025.

¶ 37. Our direct review decisions give us more of a sense of an appropriate prejudice standard. In *State v. Chambers*, 144 Vt. 377, 384, 477 A.2d 974, 979 (1984), we stated what defendant must show in order to obtain a new sentencing based on a claim of improper PSI content: "A defendant has the burden to show that the information is materially inaccurate and that the judge relied on the information at sentencing." We applied the reliance element in *State v. Cox*, 147 Vt. 421, 519 A.2d 1144 (1986), our precedent with facts closest to those before us in this case. In *Cox*, we found a Fifth Amendment violation when a probation officer required defendant to go through with a PSI interview despite defendant's request that a paralegal from the public defender's office be present. We ordered the preparation of a new PSI, and remanded for resentencing, because we found that "the sentencing judge relied on defendant's statements during sentencing." *Id.* at 426, 519 A.2d at 1147. We conclude that the reliance standard is an appropriate standard to demonstrate prejudice for purposes of postconviction review. Thus, petitioner has made a sufficient showing of prejudice here if he has shown that the sentencing judge relied upon his statement to the probation officer in the uncounseled PSI interview in determining petitioner's sentence.

¶ 38. The dissent appears to agree with this standard, but argues that petitioner made no such showing. We disagree with that conclusion for a number of reasons.

¶ 39. First, the PSI interview is where petitioner denied that he committed the crime for which he was convicted, and that denial was central to the officer's recommendation and the argument of the prosecutor at the sentencing hearing. Although we can fault petitioner for not being sufficiently explicit in accepting responsibility for the acts for which he was convicted, we cannot characterize his allocution as a denial of responsibility. Petitioner apologized to the victim, admitted he was violent, admitted he had been convicted of a horrendous crime, and said he was sorry for what he had done. The sentencing judge specifically itemized defendant's denial of responsibility as one of the reasons for the sentence. His conclusion that defendant was in denial about the crime had to have come from the PSI. In turn, the officer's conclusion that petitioner was in denial came from his interview. This conclusion alone showed reliance.

¶ 40. Second, the court explicitly stated that it relied upon the PSI in determining a sentence. It is clear that petitioner's uncounseled interview statements formed the basis for the officer's conclusions and recommendation.

¶ 41. Third, the prosecutor argued for the exact sentence the court imposed, relying in her argument on statements made by petitioner in the PSI interview. Under *Meunier*, the prosecutor's argument alone is enough to show prejudice, at least where there is no indication that the court rejected the argument.

¶ 42. Fourth, the superior court relied upon its interpretation of the sentencing court's statements, those interpretations are reasonable, and the State has not contested those interpretations either here or in the trial court. The sentencing court specifically relied upon petitioner's "own statement and allocution" and found he "has persisted in ideation and articulation of threats." Apparently, the superior court interpreted the reference to petitioner's "own statement" as the PSI statement, a reasonable interpretation because the sentencing court also specifically referred to the allocution statement. The superior court did not explicitly rely upon the reference to "articulation of threats" so the dissent's debate over the meaning of the sentencing court's reference to threats is less important. While we agree that the reference could be to threats other than those made in the PSI statement, we also note that the sentencing court's main concern was that petitioner "persisted" in making threats and the most recent threats were to the probation officer.

¶ 43. Based on the above, we specifically affirm the superior court's conclusion that as a matter of law the sentencing court relied upon defendant's uncounseled statements to the probation officer, as contained in the PSI report.

¶ 44. The dissent argues, nonetheless, that we can hold that the reliance on the uncounseled statement to the probation officer was harmless because the sentencing court could have imposed the same sentence even if petitioner had never been interviewed by the probation officer. We can ignore an error as harmless only if we can find it so beyond a reasonable doubt. See *State v. Oscarson*, 2004 VT 4, ¶ 30, 176 Vt. 176, 845 A.2d 337. Our prejudice determination, as set out above, precludes such a finding here. Indeed, if we accepted the dissent's harmless error standard for sentencing errors, virtually all sentencing errors would be harmless because the sentencing court has expansive discretion in choosing a sentence within the statutory limits. See *State v. Nelson*, 170 Vt. 125, 128, 742 A.2d 1248, 1250 (1999) (criminal

sentencing by trial court will be upheld if reasonably related to crime for which defendant was convicted); *State v. Neale*, 145 Vt. 423, 435, 491 A.2d 1025, 1033 (1985) (court has "wide discretion" in sentencing and may consider numerous factors).

¶ 45. The State has made a different argument under which we would also not reach the merits of the post-conviction petition. The State argues that even if petitioner had a Sixth Amendment right to have his counsel present at his PSI interview, he failed to invoke it. It argues that in this respect the case is indistinguishable from *State v. Cyr*, 169 Vt. 50, 56, 726 A.2d 488, 492-93 (1999) (considering possible Sixth Amendment issue with denial of counsel at presentence interview, but holding that no Sixth Amendment issue arises from facts). The defendant in *Cyr* made exactly the same argument petitioner makes in this case, that the uncounseled PSI interview violated the Sixth Amendment. However, as we explained in that decision, the facts were different:

> The defendant also claims his Sixth Amendment right to counsel was violated because his attorney was not present during the PSI. Again, the factual record in this case is insufficient to evaluate defendant's Sixth Amendment claim. Defendant does not assert that his counsel was excluded from the PSI or that he was forced to proceed without her. Defense counsel was presumably aware that the court had ordered a PSI, and the record is silent as to why she was not present during the interview.

*Id.*; cf. *State v. Hill*, 174 Vt. 566, 569, 816 A.2d 440, 444 (2002) (mem.) (no coercion present to warrant *Miranda* warnings before PSI interview where defendant never asked for counsel).

¶ 46. Here we know why counsel was not present. Petitioner's affidavit, unchallenged by the State, provided that the probation officers arrived at the prison and called petitioner to meet with them. He said: "I told [the probation officers] that I didn't want to talk with them without my lawyer being there." One of the officers said that the lawyer did not need to be present and started questioning petitioner, who answered.

¶ 47. If a Sixth Amendment right to counsel is present, the State must honor it once it has been asserted. *Maine v. Moulton*, 474 U.S. 159, 170 (1985); see also *McNeil v. Wisconsin*, 501 U.S. 171, 179 (1991) ("[A]fter the Sixth Amendment right to counsel attaches and is

invoked, any statements obtained from the accused during subsequent police-initiated custodial questioning regarding the charge at issue (even if the accused purports to waive his rights) are inadmissible."). Here, petitioner unequivocally invoked his right to counsel by telling the probation officers that he did not want to talk with them without his lawyer present. Despite this unequivocal statement, the officers continued to question him. Based on these facts, we agree with the superior court that if petitioner had a Sixth Amendment right to counsel at the PSI interview, it was violated. The superior court was correct in granting petitioner summary judgment on this issue.

¶ 48. In summary, we hold that we must decide whether petitioner had a right to counsel during the PSI interview because he attempted unsuccessfully to invoke such a right and the sentencing court relied upon statements petitioner made in the PSI interview in fashioning petitioner's prison sentence. We, therefore, address the merits of petitioner's Sixth Amendment claim.

¶ 49. The Sixth Amendment guarantees a criminal defendant the right to counsel during all "critical stages" of the adversarial proceedings against him. *United States v. Wade*, 388 U.S. 218, 224 (1967). In determining whether a particular stage is "critical," it is necessary "to analyze whether potential substantial prejudice to defendant's rights inheres in the particular confrontation and the ability of counsel to help avoid that prejudice." *Id.* at 227. The United States Supreme Court has extended "critical stages" beyond the trial itself to include certain pretrial and post-trial proceedings. *Brewer v. Williams*, 430 U.S. 387, 401 (1977) (post-indictment interrogation); *Estelle v. Smith*, 451 U.S. 454, 471 (1981) (pretrial psychiatric examination in capital case); *Mempa v. Rhay*, 389 U.S. 128, 133 (1967) (sentencing).

¶ 50. The question of whether there is a Sixth Amendment right to counsel at a presentence interview is one of first impression for this Court. We have, however, intimated that such a right exists. See *Cyr*, 169 Vt. at 56, 726 A.2d at 492-93. We have recognized the right to counsel in seeking a reconsideration of sentence, albeit on statutory grounds. *State v. Rice*, 148 Vt. 313, 315, 532 A.2d 574, 575 (1987) (public defender statute). The United States Court of Appeals for the Second Circuit has similarly not directly addressed the issue but has hinted at the existence of such a right. See *United States v. Colon*, 905 F.2d 580, 588 (2d Cir. 1990) (presentence interview may be "critical stage" under federal sentencing guidelines); *United States v. Cortes*, 922 F.2d 123, 127 (2d Cir. 1990) (same). We also note that the importance of counsel at presentence interviews has been recognized by federal rule makers.

See Fed. R. Crim. P. 32(c)(2) ("The probation officer who interviews a defendant as part of a presentence investigation must, on request, give the defendant's attorney notice and a reasonable opportunity to attend the interview."); Fed. R. Crim. P. 32, Advisory Committee Notes, 1994 Amendments ("Although the courts have not held that presentence interviews are a critical stage of the trial for purposes of the Sixth Amendment right to counsel, the [1994 Amendment] reflects case law which has indicated that requests for counsel to be present should be honored."), and by the Sixth and Ninth Circuits, *United States v. Herrera-Figueroa*, 918 F.2d 1430, 1433-37 (9th Cir. 1991) (finding no Sixth Amendment violation, court relied on its supervisory power in holding that probation officers must honor request for counsel's presence); *United States v. Tisdale*, 952 F.2d 934, 940 (6th Cir. 1992) (agreeing with *Herrera-Figueroa* rule while finding no Sixth Amendment violation).

¶ 51. "The presentence interview plays a crucial role in determining the probation officer's recommended sentence. . . . [A] single finding by the probation officer can significantly affect the ultimate sentencing range." *Herrera-Figueroa*, 918 F.2d at 1434. At a presentence interview, a defendant is likely to address matters that were not raised at trial and that will likely have a significant impact on sentencing. Moreover, a defendant's statements during a presentence interview can even have an impact on later prosecutions — of both the defendant and others. For example, in *State v. Hatt*, 38 P.3d 738, 740 (Kan. Ct. App. 2002), the court found that by statute the trial court could take judicial notice of a presentence investigation report from a prior crime, and therefore the state was not required to prove defendant's prior criminal history. Similarly, in *Germain v. State*, 769 A.2d 931, 935-37 (Md. 2001), a presentence investigation report was used to refresh a witness's memory and impeach his credibility. There, the court ruled that although by statute a presentence investigation report is generally not available for public inspection, it can be used to impeach a witness's statement. *Id.* at 941.

¶ 52. The facts of this case are a clear example of the importance of the presentence investigation and a criminal defendant's participation in the development of the report. It is not an overstatement to say that petitioner committed sentencing suicide in his PSI interview. His criminal conduct warranted a long sentence of incarceration, but in a single paragraph he ensured that he would spend virtually all of his

adult life in jail. Nothing he could say or do at the sentencing hearing could undo the self-inflicted damage.

¶ 53. The superior court decision emphasized a part of the prejudice that inhered in the uncounseled PSI interview in this case:

> Indeed, having a system which allows these reports, which generally carry great weight in the determination of a defendant's sentence, to be made without assistance of counsel leaves the indigent and inept at great disadvantage. For example, in exactly this kind of case, in which defendant testified at trial, the uncounseled and uneducated may believe that consistency is the highest virtue, perjury the greatest threat.

As the superior court stated, our system expects that the main source of information for sentencing will be the presentence investigation. The report drafted by the probation officer must contain "such information on [defendant's] characteristics, his financial condition, and the circumstances affecting his behavior as may be helpful in imposing sentence or in granting probation." V.R.Cr.P. 32(c)(2). The officer must present a sentencing recommendation, see 28 V.S.A. § 204(b), which is frequently accepted by the sentencing judge. While the defendant may supplement the PSI with additional evidence at sentencing, see V.R.Cr.P. 32(c)(4), the PSI is so comprehensive that much of the evidence is reflected in the PSI. The defendant can contest the accuracy of any sentencing information submitted by the State, including the PSI, and offer evidence on disputed issues. *Id.* Defendant's right to contest and supplement sentencing information may be critically important to ensuring the fairness of the sentencing process in many cases, but in cases like this the use of these rights is not likely to overcome a bad presentence interview. For example, petitioner in this case used his allocution to convey exactly the opposite message from that he conveyed in the presentence interview. He apologized to the victim and said he was prepared to change his conduct. Not surprisingly, the sentencing judge completely ignored the allocution statement.

¶ 54. We also agree with the superior court that a criminal defendant, who testifies that he is innocent of the charged conduct, is unlikely to understand the need to admit responsibility for that conduct to improve his prospects at sentencing. See *State v. Sims*, 158 Vt. 173, 188-89, 608 A.2d 1149, 1158 (1991) (sentencing court may consider defendant's refusal to acknowledge his crime after guilty conviction).

On the other hand, admission of responsibility will constitute a waiver of defendant's self-incrimination right and could be the basis for a perjury prosecution. Further, in this case petitioner appealed his conviction and sought a retrial where any admission might be introduced against him. The hard choices involved in sex offense cases has caused us to hold that sex offenders, convicted after trial, have immunity for statements made at sentencing that are incriminating and are required for successful completion of probation. See *State v. Loveland*, 165 Vt. at 427, 684 A.2d at 278 ("[W]e want to fashion a rule that encourages convicted defendants to accept treatment and rehabilitation, rather than emerging untreated from incarceration, however far in the future."). Although petitioner here had little chance of probation, we similarly want to encourage him to admit responsibility and accept treatment. Thus, much of the *Loveland* rationale applies here, but we have never had the opportunity to consider whether judicial immunity should extend to a PSI interview.

¶ 55. We recognize that defendants and their counsel know that there will be a presentence interview and that the choices that petitioner faced warranted legal counseling, and possibly negotiation, before the interview occurred. See *State v. Smith*, 863 P.2d 1000, 1007-08 (Mont. 1993) (no violation of Sixth Amendment where counsel excluded from PSI interview if counsel knows of interview and has adequate opportunity to prepare the client). The record is silent on whether petitioner's trial counsel prepared him for the presentence interview. In any event, preinterview counseling may be of limited value in many cases if counsel is excluded from the interview where the questions are actually asked. See D. Berman, *From Lawlessness to Too Much Law? Exploring the Risk of Disparity from Differences in Defense Counsel Under Guidelines Sentencing*, 87 Iowa L. Rev. 435, 452 (2002) ("As some commentators have stressed, counsel is not only well advised to be present for any presentence interview of the defendant, but also to prepare his client for the interview so that the defendant knows what information the probation officer will be seeking and what facts are relevant and helpful to his case.").

¶ 56. There is a larger point in this aspect of our rationale. A substantial part of the probation officer's report analyzed the availability of rehabilitation, treatment and parole opportunities in light of petitioner's conduct and attitude. The Legislature has required this evaluation in cases where the defendant is charged with aggravated sexual assault or other specified sex offenses. See 28 V.S.A. § 204(f). In

this case, the PSI report concluded that petitioner was not suitable for treatment because he refused to admit committing the offense. It reasoned that without treatment petitioner would be unable to change, and without change produced through treatment petitioner posed a high risk to the community. When the court imposed its sentence, it noted that petitioner was not amenable to outpatient treatment and stated that "any rehabilitation in Mr. Carter's case would be achieved during a course or term of his incarceration." By refusing to admit he committed the offense, petitioner bypassed the opportunity to be considered for treatment and increased the likelihood he would receive the maximum sentence.

¶ 57. We cannot expect a defendant to navigate the correctional programming system unassisted. Since his sentence will be determined, in part, based on policies and programs of the Department of Corrections and the Parole Board, he needs to address how he fits within those policies and programs. As this case demonstrates, he needs to address the policies and programs at the presentence interview because the probation officer will conduct a professional evaluation of him and his conduct in light of those policies and programs and make his sentencing recommendation based on that evaluation.

¶ 58. We emphasize this point because some have argued that a right to counsel is necessary in the federal guideline sentencing system, but perhaps not in systems without guidelines. See Note, *The Presentence Interview and the Right to Counsel: A Critical Stage Under the Federal Sentencing Structure*, 34 Wm. & Mary L. Rev. 527, 538, 558-60 (1993). In the federal guideline system, the defendant's sentence is calculated by applying specific sentencing norms in light of defendant's "offense behavior" and "offender characteristics." *Federal Sentencing Manual*, 1 (2001). To determine the applicable offense behaviors and offender characteristics, a probation officer conducts a "fact-finding" interview with the defendant. See Comment, *Access, Accuracy and Fairness: The Federal Presentence Investigation Report Under Julian and the Sentencing Guidelines*, 1989 Wis. L. Rev. 837, 840-41 (1989). Following this interview, the probation officer makes preliminary ruling about the facts of the case and the applicable law and drafts a presentence investigation report. P. Metzger, *Beyond the Bright Line: A Contemporary Right-To-Counsel Doctrine*, 97 Nw. U. L. Rev. 1635, 1673 (2003). Within the report, the probation officer, based on his or her "factual findings," recommends where "within the applicable guidelines range" the defendant should be sentenced. *Id.*

The probation officer's "factual findings" are determined by the answers the defendant gives to the probation officer's questions. *Id.* at 1677. Accordingly, an uncounseled defendant runs the risk of unwittingly increasing his or her sentence.

¶ 59. The argument that the federal guideline system has turned the PSI interview into a critical stage of the proceeding is based upon the rules that dramatically reduce the discretion of the sentencing judge and upon the central role of the PSI report in determining the sentence that is imposed. The argument, however, compares the current federal sentencing system with its predecessor and not with the Vermont system. In our view, there is no significant difference between the role and influence of the presentence investigation, and the nature of the interview of the defendant within it, in the federal and Vermont systems, particularly with respect to sex offenses where the Vermont probation officer must report pursuant to 28 V.S.A. § 204(f) and the facts of the offense have been determined in a trial. In neither system is the PSI report binding on the sentencing judge, but in both it is very influential. Although Vermont judges have more discretion in sentencing than do their federal colleagues, in practice the sentence is based on offense behavior and offender characteristics and history, much like in the federal system. Indeed, the effect of certain offender characteristics is predictable, especially in sex offense and domestic violence cases where the sentence is heavily dependent on the likely success of treatment and rehabilitation programs. See, e.g., *State v. Fisk,* 165 Vt. 260, 264-65, 682 A.2d 937, 939-40 (1996) (if, after conviction, defendant still will not admit crime and thus does not qualify for treatment, maximum sentence will be imposed) (Dooley, J., dissenting). On the other hand, while the federal sentencing system is relatively transparent, the Vermont system is relatively obscure, and effective participation in it requires the expertise of someone knowledgeable about correctional and parole policy, as well as the past actions of sentencing judges. For this reason, we view the need for professional legal assistance in the sentencing process, and particularly in the PSI interview, as greater in the Vermont system than in the federal guideline system.

¶ 60. Although our view is that the relevant considerations weigh strongly in favor of a Sixth Amendment right to counsel in the PSI interview, we recognize that the vast majority of federal courts that have addressed the issue have held to the contrary. See *Castro v. Ward,* 138 F.3d 810, 821-22 (10th Cir. 1998); *United States v. Gordon,* 4

F.3d 1567, 1571-72 (10th Cir. 1993); *Tisdale*, 952 F.2d at 939-40; *United States v. Hicks*, 948 F.2d 877, 885-86 (4th Cir. 1991); *United States v. Jackson*, 886 F.2d 838, 845 (7th Cir. 1989); *Brown v. Butler*, 811 F.2d 938, 941 (5th Cir. 1987); *Baumann v. United States*, 692 F.2d 565, 578 (9th Cir. 1982). But see *Hoffman v. Arave*, 236 F.3d 523, 540 (9th Cir. 2001) (presentence interview is critical stage in a capital case); *United States v. Weiskopf*, No. 96-2648, 1997 WL 66517, at *4 (7th Cir. Feb. 7, 1997) (PSI interview "may constitute a critical stage of a criminal proceeding when that probation officer plays an adversarial role in the sentencing proceedings"); *Colon*, 905 F.2d at 588 (suggesting, without deciding, that under new federal guidelines system PSI may be a critical stage); *Cortez*, 922 F.2d at 127 (same).

¶ 61. The state cases tend to follow the federal majority cases. See *Musgrove v. State*, 638 So. 2d 1347, 1352 (Ala. Ct. Crim. App. 1992); *State v. Pete*, 857 So. 2d 1107, 1110 (La. Ct. App. 2003); *People v. Daniels*, 386 N.W.2d 609, 613 (Mich. Ct. App. 1986); *State v. Barber*, 494 N.W.2d 497, 501-02 (Minn. Ct. App. 1993); *People v. Cortijo*, 739 N.Y.S.2d 19, 20 (App. Div. 2002); *Commonwealth v. Burton*, 301 A.2d 675, 676-77 (Pa. 1973); *State v. Knapp*, 330 N.W.2d 242, 243-45 (Wis. Ct. App. 1983). But see *State ex rel. Russell v. Jones*, 647 P.2d 904, 907 (Or. 1982) (en banc) (defendant has Sixth Amendment right to counsel at PSI interview). These decisions have been extensively criticized. See Metzger, *supra*, 97 Nw. U. L. Rev. at 1695-98; Note, *supra*, 34 Wm. & Mary L. Rev. at 571; M. Etienne, *Remorse, Responsibility, and Regulating Advocacy: Making Defendants Pay for the Sins of their Lawyers*, 78 N.Y.U. L. Rev. 2103, 2140-42 (2003).

¶ 62. We find most of these decisions unpersuasive or inapplicable. They rest on the assertion that critical stage analysis of the presentence interview "depends upon the nature of the probation officer's role in sentence determination" and since the probation officer is "an extension of the court and not an agent of the government," the presentence interview is not a critical stage. *Jackson*, 886 F.2d at 844. But no Supreme Court decision supports the rationale of *Jackson* and other circuit court decisions that conclude that the right to counsel is limited to proceedings with an "adversary character." *Id.* at 843.[4] See

---

[4] Most of these circuit decisions rely on *Kirby v. Illinois*, 406 U.S. 682, 690 (1972) ("an accused is entitled to counsel at any critical stage of the *prosecution*") for the requirement that a proceeding must have an adversarial character to be critical stage. This reliance is misplaced. The Court in *Kirby* emphasized *prosecution* to distinguish critical stages deserving of Sixth Amendment protection from proceedings "that took place long before the commencement of any prosecution whatever." *Id.*

Note, *supra*, 34 Wm. & Mary L. Rev. at 550-60. Further, this assertion is contrary to the long line of Supreme Court cases holding that a defendant's right to counsel under the Sixth Amendment depends primarily on the possibility of prejudice and unfairness in the proceedings and the ability of the presence of counsel to protect against such prejudice and unfairness. See *Townsend v. Burke*, 334 U.S. 736, 740-41 (1948) (right to counsel violated where defendant was "disadvantaged by lack of counsel"); *Moore v. Michigan*, 355 U.S. 155, 160 (1957) ("[P]etitioner's rights could not have been fairly protected without the assistance of counsel to help him with his defense."); *Hamilton v. Alabama*, 368 U.S. 52, 54 (1961) (arraignment is critical stage because without counsel, "[a]vailable defenses may be . . . irretrievably lost"); *Stovall v. Denno*, 388 U.S. 293, 298 (1967) (partially overruled on unrelated grounds) ("The possibility of unfairness [during confrontations for identification] is great . . . . The presence of counsel will significantly promote fairness at the confrontation and a full hearing at trial on the issue of identification."); *Estelle*, 451 U.S. at 469 (recognizing the "vital need for a lawyer's advice and aid during the pretrial phase") (internal quotations omitted); *Mempa*, 389 U.S. at 134 (counsel required "at every stage of a criminal proceeding where substantial rights of a criminal accused may be affected"). The Court in *Wade* firmly established that a criminal defendant is entitled to counsel "at any stage of the prosecution, formal or informal, in court or out, where counsel's absence might derogate from the accused's right to a fair trial." 388 U.S. at 226.

¶ 63. Moreover, as the analysis of the Oregon Supreme Court in *Jones* demonstrates, the reliance on the nonadversary nature of the PSI interview is a two-edged sword. *Jones* found a Sixth Amendment right because the court viewed the PSI interview primarily as an efficiency device to avoid the necessity of similar questioning by the sentencing judge:

> A judge's election to gather sentencing information through the agency of a probation officer or another makes the process no less a judicial procedure than when the judge does so directly. The investigation is simply an out-of-court inquiry and hearing on behalf of the judge. . . . In other words, the investigator informally performs for the judge a function, in part, which would otherwise be performed by the

judge as part of the formal sentencing hearing. Functionally, the investigation is a part of the sentencing procedure.

647 P.2d at 906 (internal citations omitted). Thus, the court held that "defendant is entitled to the assistance of counsel to the same degree when the judge seeks sentencing information from him in open court and when the judge does so indirectly through the out-of-court agency of a probation officer." *Id.*

¶ 64. Even if we found the PSI interview to be a nonadversary event, we would hold that the right to counsel is not limited to adversary events and adopt the holding of *Jones*. There are, however, grounds to distinguish the PSI process in the federal system from that employed in Vermont, particularly in this case. In the federal system, the probation officer is an employee of the judicial branch. In contrast, in Vermont, the probation officer who prepares the report is an employee of the executive branch, responsible to the Commissioner of Corrections. In the federal system, as an employee of the court, the probation officer is insulated from political pressure and answers to no one but the sentencing judge. See *Schiff v. Dorsey*, 877 F. Supp. 73, 77 (D. Conn. 1994) ("probation officers are insulated from the political influences of the legislative and executive branches because they are appointed and removed by the district court"); see also Note, *The Probation Officer and the Federal Sentencing Guidelines: Strange Philosophical Bedfellows*, 104 Yale L.J. 933, 945 (1995) ("With allegiances to no one but the court, the officer's only 'agenda' was to provide as much information about the defendant to the sentencing judge as possible."). There are no similar safeguards in the Vermont system.

¶ 65. We recognize that the probation officer who prepares the PSI is normally not an agent of the prosecutor and the prosecutor does not direct the actions of the probation officer. In this case, however, the probation officer appeared at the sentencing hearing as the only witness for the State. Rather than relying upon the written report, the prosecutor presented oral testimony from the officer emphasizing the reasons for a long sentence of incarceration, a sentence longer than that recommended by the officer. Central in the testimony, and in the prosecutor's sentencing recommendations, were the statement petitioner made in his PSI interview. The officer became, in essence, an expert witness for the prosecution in the adversary sentencing hearing.

¶ 66. For the above reasons, we hold that the PSI interview was a critical stage of the sentencing process and, therefore, a Sixth Amendment right to counsel attaches to the interview. Once petitioner invoked his right to counsel, interviewing should have stopped until counsel was given the opportunity to be present. The superior court correctly ruled that the violation of the right to counsel requires that petitioner be resentenced.

*Affirmed.*

¶ 67. **Amestoy, C.J.,** dissenting. I respectfully dissent from the majority's determination that petitioner's Sixth Amendment right to counsel was violated. In light of all the other factors considered at sentencing, the trial court's reliance, if any, on petitioner's presentence interview statements would have been harmless error. Moreover the superior court's grant of summary judgment to petitioner on Sixth Amendment grounds was error because a presentence interview is not a "critical stage" of adversarial proceedings against a criminal defendant.

¶ 68. The superior court's ruling was based on the erroneous understanding that the sentencing court specifically considered and relied on petitioner's statements during the presentence interview in its determination of petitioner's sentence. The record does not support this conclusion. Instead, the record shows that the court expressly considered petitioner's own statement and allocution *at the sentencing proceeding*, in which petitioner persisted in minimizing the gravity of the crime and its impact upon the victim. Further, the record demonstrates that the sentencing judge evaluated many other factors, some contained in the presentence report but not taken from petitioner's interview, and some entirely unrelated to the presentence report.

¶ 69. Prior to issuing its sentence, the sentencing court provided its reasons for the severity of the sentence. The court noted that the character of an aggravated assault is highly relevant to sentencing, and in this case, "this was a brutal rape . . . committed within her own home place," at a time when the victim's infant children were in the home. The court found that the sexual assault was accompanied by the brandishing of a knife, the use of physical force, and "a series of interactions that can only be described as horrific at the time of commission of the aggravated sexual assault." The court also found that there was no credible evidence of any "operative mental disease" which would mitigate a finding that petitioner's "actions were fully

intentional, fully calculated, fully consciously and deliberately engaged in by him." The court found, however, that petitioner remained a "source of great risk to the community" based on petitioner's psychiatric evaluation — not part of the presentence report — which diagnosed petitioner with "antisocial personality disorder, paranoid personality disorder, sexual sadism, [and] substance abuse." The sentencing court concluded that the petitioner was not currently amenable to necessary treatment, including outpatient treatment, nor "amenable historically to probation supervision."

¶ 70. In addition, the court also took into account that petitioner fled the jurisdiction to avoid prosecution, "and during the course of flight ... he persisted in a pattern of physical abuse, violence and intimidation as to [his then girlfriend]." The court noted that petitioner "persisted in ideation and articulation of threats" which posed a "grave risk" to the victim and petitioner's former girlfriend. While the court obtained this information through the presentence report, it was not elicited from petitioner but from petitioner's former girlfriend. Petitioner's ex-girlfriend told the probation officer about petitioner's plans to kill the victim if petitioner was ever brought to court in Vermont, about the sexual and physical abuse she — the ex-girlfriend — had suffered while living with petitioner, and about the threats that petitioner had used against her, which involved acts of sexual violence and mutilation. Finally, the court took into consideration petitioner's prior convictions, which included a felony conviction for burglary, a felony conviction for aggravated assault, and two felony convictions for escape.

¶ 71. Although the sentencing court noted that it had "considered the content of the pre-sentence investigation report," at no point in the record did the sentencing court make reference to petitioner's statements at the presentence interview. The court did, however, take into consideration petitioner's statements at the sentencing hearing, and referred specifically to them, particularly noting that petitioner "continues to ... this very day to minimize the impact of his crime upon [the victim]." Thus, contrary to the majority's assertion, the sentencing judge did not "completely ignore" the allocution statement; rather, the court took good notice of the insufficiency of petitioner's apology. For example, although petitioner at sentencing conceded that it was a "horrendous crime" for which he was sorry, he minimized the impact on the victim: "Everybody says it's a horrendous crime. Looking back at the presentence, it's a horrendous crime. The victim

only did counseling for eight months. I think it would be . . . more if she went through a tough time . . . ."

¶ 72. The superior court's conclusion that "petitioner's pre-sentence interview proved to be a critical stage of the ultimate adjudication against him" is predicated on the sentencing court's alleged specific consideration of petitioner's "negative statements about the complaining witness and his [petitioner's] willingness to engage in treatment" which, in turn, according to the superior court, "clearly influenced the duration of petitioner's sentence." I do not find any record evidence of such influence on a sentence that was fully justified and explained by reliance on factors other than petitioner's uncounseled presentence interview statements.

¶ 73. In any event, assuming that the court had improperly relied on the presentence interview, I do not agree with the majority that the "reliance standard" is the appropriate measure to demonstrate prejudice for purposes of post-conviction relief. The harmless error doctrine applies to sentencing proceedings. *State v. Bacon*, 169 Vt. 268, 273, 733 A.2d 50, 54 (1999). Accordingly, we have previously held that erroneous consideration of an improper factor at sentencing is harmless, if the trial court properly considered additional factors that provide an independent basis for the decision. *Id.*; see also *State v. Merchant*, 173 Vt. 249, 258-59, 790 A.2d 386, 394 (2001) (any error in trial court's citation of defendant's statements at sentencing as basis for rejecting a probationary sentence harmless where trial court also considered defendant's history of violent behavior, prior conviction for similar offense and prior incidents of similar conduct). Here, it is clear from the record that the trial court took into account the brutality of the crime, petitioner's psychiatric evaluation, his prior convictions for assaultive behavior, and his history of escape and flight. Those factors amply support the trial court's sentence determination. Therefore, reliance on petitioner's PSI statements, even if improper, would have been harmless.

¶ 74. Nevertheless, the majority has held that defendants have an absolute constitutional right to counsel during the presentence interview. Because I believe there is a fundamental distinction between the presentence interview and the criminal proceeding stages previously held to be "critical," I respectfully dissent.

¶ 75. Unlike previously established critical stages, "[t]he purpose of the presentence report, including associated interviews, is neither prosecutorial nor punitive." *United States v. Rogers*, 921 F.2d 975, 979

(10th Cir. 1990). For instance, unlike a presentence interview, the psychiatric interview held a critical stage in the oft cited *Estelle* involved "questions that would be used in order to prove, beyond a reasonable doubt, the critical aggravating factor of dangerousness." *Baumann v. United States*, 692 F.2d 565, 578 (9th Cir. 1982); see *Estelle v. Smith*, 451 U.S. 454, 471 (1981). Whereas the denial of counsel to that proceeding "impaired the fairness of the jury trial itself," *Baumann*, 692 F.2d at 578, the presentence interview in Vermont does not take place "until there has been an adjudication of guilt, unless the defendant consents to such action." V.R.Cr.P. 32(c)(1). Thus, since when the presentence interview is conducted, "the guilt determination has been concluded and statements which the defendant makes cannot be used to convict him of any crime," *Lang v. State*, 461 N.E.2d 1110, 1115 (Ind. 1984), the presentence investigation cannot result in the kind of prejudice guarded against in *Estelle*.

¶ 76. The development of individualized sentencing procedures such as the presentence investigation is "intimately connected with the rehabilitative model of sentencing." S. Fennell & W. Hall, *Due Process at Sentencing: An Empirical and Legal Analysis of the Disclosure of Presentence Reports in Federal Courts*, 93 Harv. L. Rev. 1613, 1621 (1980). The presentence interview's function is " 'to give to the sentencing judge the fullest possible information concerning the defendant's life and characteristics so that he may be able to impose an appropriate sentence.' " *State v. Ramsay*, 146 Vt. 70, 78, 499 A.2d 15, 20 (1985) (quoting *United States v. Burton*, 631 F.2d 280, 282 (4th Cir. 1980)). Elements assessed in the presentence interview include the defendant's acceptance of responsibility and expression of remorse. *State v. Muscari*, 174 Vt. 101, 113, 807 A.2d 407, 417 (2002). The presentence interview, however, is just one component in the presentence investigation report. The report as a whole contains "any prior criminal record of the defendant and such information on his characteristics, his financial condition, and the circumstances affecting his behavior as may be helpful in imposing sentence or in granting probation or in the correctional treatment of the defendant." V.R.Cr.P. 32(c)(2). The presentence report allows the court to conduct the individualized inquiry necessary to properly carry the responsibility of imposing a sentence:

> "The theory behind the use of presentence investigations is that the sentence should be individualized to the offender: it should fit him, not merely the crime. If criminal correction is intended to effect reformation and rehabilitation, as well as to

provide protection to the public, the sentence should be tailored to the defendant's life history and personal characteristics."

*State ex rel. Russell v. Jones*, 647 P.2d 904, 910 (Or. 1982) (Peterson, J., dissenting) (quoting *Buchea v. Sullivan*, 497 P.2d 1169, 1172 (Or. 1972)).

¶ 77. I do not find persuasive the majority's rationale that a defendant's Sixth Amendment right to counsel should depend — not on the adversarial nature of the proceeding — but on the ability of the presence of counsel to protect defendant from "the possibility of prejudice and unfairness in the proceedings." *Ante*, at ¶ 62. Competent counsel, at any stage of defendant's involvement with the criminal justice system, could presumably protect a defendant from the "possibility" of unfairness and prejudice, but that is not the basis upon which we — or any other court — have previously analyzed the right to counsel issue. See, e.g., *State v. Kennison*, 149 Vt. 643, 645-46, 546 A.2d 190, 192 (1987) (no right of counsel attaches under either United States or Vermont Constitutions where nontestimonial order was granted ex parte and without notice to defense counsel because "[t]he United States Supreme Court and this Court have both noted that the taking of nontestimonial identification evidence ... is not a 'critical stage' at which the right to counsel attaches.") (quoting *United States v. Wade*, 388 U.S. 218, 227-28 (1967)).

¶ 78. Nor do I find persuasive the majority's statement that there is no significant difference between the role and influence of the presentence investigation in the federal and Vermont systems. First, even if this representation were accurate, no federal court has found a Sixth Amendment right to counsel at a presentence interview. See *United States v. Gordon*, 4 F.3d 1567, 1572 (10th Cir. 1993) (holding no Sixth Amendment right to counsel at presentence interview); *United States v. Tisdale*, 952 F.2d 934, 940 (6th Cir. 1992) (holding that even under federal sentencing guidelines presentence interview in noncapital cases is not a critical stage of the prosecution); *United States v. Hicks*, 948 F.2d 877, 885-86 (4th Cir. 1991) (holding no Sixth Amendment right to counsel in routine presentence interviews because not a critical stage of criminal proceedings); *United States v. Johnson*, 935 F.2d 47, 50 (4th Cir.), *cert. denied*, 502 U.S. 991 (1991) (no Sixth Amendment right to counsel for ex parte communications between court and probation officer regarding PSI because court's communications with

its own agent are nonadversarial); *United States v. Jackson*, 886 F.2d 838, 845 (7th Cir. 1989) (holding no Sixth Amendment right to counsel at presentence interview); *Brown v. Butler*, 811 F.2d 938, 941 (5th Cir. 1987) (holding presentence interview not critical stage of criminal proceedings); *Baumann*, 692 F.2d at 578 (holding presentence interview not a critical stage of criminal proceedings).

¶ 79. Moreover, the distinctions between the Vermont approach to sentencing and the federal approach to sentencing suggest that the very reason given by those federal courts expressing apprehension about the use of uncounselled presentence interview statements of defendant is *not* present in Vermont. Of most significance is the contrast between a defendant's right in Vermont to refuse a presentence interview or request that disposition be made without a presentence report, V.R.Cr.P. 32(c)(1)(C), and the changes wrought by Federal Sentencing Guidelines, which made "the presentence interview mandatory by not allowing a defendant to waive preparation of a presentence report," *United States v. Saenz*, 915 F.2d 1046, 1048 n.2 (6th Cir. 1990), and drastically increased the impact of the interview by limiting the court's sentencing discretion. *United States v. Colon*, 905 F.2d 580, 588 (2d Cir. 1990). These changes have altered the perception of some federal courts of the presentence interview's significance. See *United States v. Cortes*, 922 F.2d 123, 127 (2d Cir. 1990) (suggesting, without addressing directly, that Guidelines may have altered sentencing process enough to make presentence interview a critical stage); *Colon*, 905 F.2d at 588 (suggesting that sentencing process and probation officer's function has been significantly altered by Guidelines while declining to directly address issue). See also Note, *The Presentence Interview and the Right to Counsel: A Critical Stage Under the Federal Sentencing Structure*, 34 Wm. & Mary L. Rev. 527, *passim* (1993) (explaining how Guidelines have changed presentence interview from a flexible aid to judge's exercise of discretion into mandatory stage that can prove crucial for defendant and that requires presence of counsel).

¶ 80. Further, the majority states that the need for professional legal assistance in the sentencing process is greater in Vermont because our system is "relatively obscure," in contrast with the federal sentencing system, which the majority portrays as "relatively transparent." *Ante*, at ¶ 59. I would argue that such "transparency" is better described as the rigidity of a system in which guidelines and tables leave little discretion to the court and predetermine the defendant's sentence. In contrast with the federal system, a Vermont

defendant is not left uncounselled and unprotected against potential prejudice and unfairness of a presentence investigation. Vermont's rules of criminal procedure provide defendant with an opportunity to challenge a presentence report that is biased, incomplete, or contains inaccurate information. V.R.Cr.P. 32(c)(4). Defendant and counsel are entitled to sufficient time to review the report prior to the sentencing hearing so "as to afford reasonable opportunity ... to decide what information, if any, [the defendant] intend[s] to controvert by the production of evidence." V.R.Cr.P. 32(c)(3). If the defendant objects to any of the facts contained in the report, the court will not take such information into account "unless, after hearing, the court makes a specific finding as to each fact objected to that the fact has been shown to be reliable by a preponderance of the evidence." V.R.Cr.P. 32(c)(4).

¶ 81. The majority's attempt to distinguish Vermont and federal probation officers does not, in my judgment, support an extension of a Sixth Amendment right of counsel. The role of a Vermont probation officer is not significantly different from that of a federal probation officer simply because in Vermont the officer is technically employed by the executive branch. As the majority acknowledges, a probation officer is not an agent of the prosecution. The rules specifically state that "[t]he commissioner of corrections shall make the presentence investigation and *report to the court* ...." V.R.Cr.P. 32(c)(1) (emphasis added). Thus, like their federal counterparts, probation officers function as a "neutral, information-gathering agent of the court." *Johnson*, 935 F.2d at 50. See also *Jackson*, 886 F.2d at 844 (probation officer "is an extension of the court" and "does not have an adversarial role in the sentencing proceedings"). We have noted, in declining to extend *Miranda* warnings prior to presentence interviews, that "probation officers are not conducting coercive interrogations with defendants." *State v. Cyr*, 169 Vt. 50, 55, 726 A.2d 488, 492 (1999).

¶ 82. Finally, although I share the majority's view that the Constitution ought to be construed to diminish the possibility of prejudice and unfairness in the criminal justice system, I do not believe that will be the result of a decision to extend the Sixth Amendment right to counsel to presentence interviews. The more likely impact will be to transform presentence investigations into adversarial proceedings that will divert overburdened public defenders from the truly critical stages of adversarial proceedings. Judges will no longer be able to rely on a nonprosecutorial information-gathering process undertaken by a neutral probation officer. Ultimately, I believe, the unintended

consequence of this attempt to protect defendants from unfairness in sentencing will be a determinate sentencing system in which a judge has no sentencing discretion, and a defendant's statements make no difference at all.