Robinson, J.,
¶ 43. dissenting. I don’t take issue with the legal standards articulated by the majority, but conclude that those standards compel reversal in this case. The jury heard evidence of multiple distinct instances of alleged abuse, with varying defenses and outcomes. In closing, with respect to the child cruelty charge, the State invited the jury to convict on the basis of any or all of them. On appeal, the State suggests with confidence that the jury was relying on a particular set of evidence in convicting on that count — completely different evidence from that relied upon by the majority in concluding that any error was harmless. On this record, the failure to include a unanimity instruction was error, and the error was sufficiently prejudicial to constitute plain error.
¶ 44. This is not the kind of “multiple-acts” case in which the evidence points to a multiplicity of relatively undifferentiated incidents and the defense is a general denial to any and all. The *17 State presented evidence of several distinct and dissimilar injuries to the child victim. Some but not all were the basis for separate domestic assault charges. The jury heard specific and varied defenses to each. And the strength and quality of the State’s evidence in support of its respective domestic assault charges varied widely from charge to charge: one charge never made it to the jury, the jury acquitted on one, and the jury convicted on one.
¶ 45. The incident charged as domestic assault took place around September 7, 2012. E.P.’s nursery school teacher testified that when E.P. arrived for her first day of school that year she had two black eyes. The teacher described E.P.’s eyes as being “blackened.” The teacher testified that the eyes were not swollen, and looked like something had happened a couple days before. She asked the mother about what had happened, and the mother reported that the child had fallen on a metal bedframe.
¶ 46. In her own testimony, the mother explained that her boyfriend, defendant, was watching E.P. at the time of this injury. When the mother arrived at the friend’s apartment, she saw E.P. lying down with an icepack. The mother removed the icepack and saw bruising and puffiness. She reported that defendant told her that when he tried to put E.P. down for a nap, E.P. was “[fljailing around and hit her head off the metal bedframe.” The mother took E.P. home and continued to ice the bruised area, but did not otherwise seek medical attention.
¶ 47. The nurse who testified as the State’s medical expert explained that a blow to the forehead or scalp above the eyes can, after a period of time, lead to the kind of discoloration of both of the child’s eyelids observed by the teacher, as the blood drains down from above the eyes.
¶ 48. In closing, defense counsel emphasized that, although the teacher testified that the child’s eyes were discolored when the child reported to school, they were not swollen or puffy. He pointed to the nurse’s testimony that this discoloration of the eyelids without accompanying swelling is consistent with an impact, some period prior, to the forehead or scalp — an injury consistent with defendant’s explanation to the child’s mother that the child had hit her head on the bedframe. Moreover, defense counsel noted that the testimony reflected that the injury occurred when the child was with defendant; based on the times defendant was with the child, it must have happened a few days before September 7. And he emphasized that between the time the injury *18 likely occurred and the child’s first day attending school, the child had a doctor’s appointment. The doctor did not document any concerns about the bruising of the child’s eyes. In short, although defendant generally denied the charges against him, the defense case in response to the charge relating to the two black eyes was specific to that incident. The defense argument was not simply “she must have tripped because she is not very coordinated” and “I had nothing to do with it.” Rather, the evidence pointed to an innocent explanation for the specific bruising pattern that gave rise to one of the domestic assault charges.
¶ 49. This incident-specific defense must have been effective; the jury acquitted defendant of the domestic assault charge relating to the “two black eyes” claim.
¶ 50. The second charged incident led to bruising observed around September 18. The child’s teacher testified that E.R had been absent the prior day, and when E.R returned to school on the eighteenth, she had a bruise on her face. On cross-examination, the teacher testified that at that time the child also volunteered that she had a bruise somewhere else, although the teacher did not specify where.[7] Concluding that the State had not presented any evidence placing the child with defendant during the time period when the bruise appeared, the trial granted defendant’s motion for judgment of acquittal on this count. Although the court dismissed the specific charge relating to the bruising observed on September 18, the State’s evidence concerning that bruise was before the jury as it deliberated on the child cruelty charge.
¶ 51. The third charged incident involved an injury the teacher observed on October 11, 2012. The teacher testified that the child had missed school the prior day and showed up to school with “a huge black eye.” E.R’s eye was “very swollen” and it appeared to the teacher that the injury “had happened recently.” The court admitted photos taken that morning showing E.R with a dark purple and blue bruise over her left eye. That morning, the teacher made a report to the Department for Children and Families (DCF).
¶ 52. Mother testified that on the morning when she saw E.R’s eye defendant explained that the injury had occurred the night *19 before when he was heading to the bathroom at the same time as the child. Defendant told her that they bumped into each other, and the child hit the doorknob. The investigating detective presented evidence, including a videotape of his interview of defendant, that shows defendant making inconsistent statements about the circumstances surrounding the left-eye injury, all of which involved hitting the bathroom doorknob. The nurse described the mechanism of injury that leads to bruising like that observed to the child’s left eye: not a flat surface, but direct impact by something like a ball or body part of a person that hits right in the right area. Additionally, the jury heard evidence regarding the layout of the child’s house and, in particular, the bathroom and bathroom door.
¶ 53. In closing, defense counsel reviewed the layout of the bathroom, including the height of the doorknob as compared to the child’s height. He argued that E.P.’s injury was entirely consistent with going to the bathroom at night, in the dark, and hitting her eye against the doorknob on her way out. He bolstered this theory by noting the child had a visual depth perception problem. He noted the implausibility of defendant’s hitting E.P. in the eye in the middle of the night without the mother hearing. And, he argued that defendant was left handed, and that if a left-handed person punches another, the black eye would be on the right. The jury was not persuaded by these arguments, because it convicted defendant of domestic assault in connection with the black eye.
¶ 54. In addition to these instances that underlay the specific domestic assault charges, the jury heard extensive evidence about the nurse’s observations upon performing a head-to-toe examination of E.P. on October 16, following the teacher’s report to DCF. In addition to the bruised eyelids, the nurse noted a bruise about a centimeter wide on the child’s cheek, a half centimeter bruise on the child’s jawline, a small bruise on the child’s forearm, two clusters of petechial bruising (tiny pinpoint bruises resulting from burst blood vessels) on one side of her neckline, bruising a couple centimeters wide on the left side of her ribs, a bruise near her bellybutton, and bruising on her shin.
¶ 55. The State elicited substantial testimony about these other injuries. The nurse opined that it’s possible to bruise the cheek by accident, but not as likely as the forehead or chin, and that the jawline is likewise not a “leading edge” that is more prone to *20 injury. She explained that petechial bruising arises from back pressure, or from occlusion of blood flow. As an example, the nurse explained that pulling clothing with enough force around the neck could cut off blood flow and cause petechial bruising. The nurse testified that the ribs are an area where she doesn’t commonly see bruises on children. With respect to the abdominal bruising, the nurse opined that such bruising results from compression of the tissue from two hard objects outside of the body. The nurse testified that the shin bruising was typical in active children. The State did not attempt to specifically link these bruises to specific instances or to defendant in particular, beyond the broad inference that defendant was one of the adults caring for the child during the relevant time period.
¶ 56. With this understanding of the record, and applying the standards articulated by the majority, whether the court should have given a unanimity instruction is not a close call. The majority acknowledges that generally in multiple-acts cases the State is either required to elect a single act as a basis for the charged offense or the instruction requires the jury to be unanimous as to which act supports a conviction. Ante, ¶ 22. The majority explains that exceptions to this general rule apply in cases in which the evidence does not materially distinguish among the various acts in question, ante, ¶ 23, or “the same blanket or generic defense was proffered with respect to all of the acts.” Ante, ¶ 25. Neither of these exceptions applies here.
¶ 57. This is not a case in which the evidence does not materially distinguish among the various acts in question. Perhaps the subset of the State’s case relating to the assortment of bruises observed during the nurse’s head-to-toe examination fits this description; but the State’s case more broadly rested largely, albeit not exclusively, on very specific allegations of injuries allegedly inflicted by defendant on specific occasions. Defendant’s arguments in response were likewise focused on specific and distinct instances. Although the defense suggested generally that this was an active but somewhat uncoordinated child with a visual impairment who was therefore prone to bruising, the defense strategy also rested in large part on specific theories as to the mechanism of the two most significant injuries at the center of the State’s case. The fact that the jury was apparently swayed by defendant’s argument with respect to one incident, but not another, highlights the material distinctiveness of the evidence with respect to the two main instances of alleged assault.
*21 ¶ 58. Nor can the defense in this case be fairly characterized as a “blanket” or “generic” defense that boils down to “I played no role in causing any of the child’s bruises.” Ante, ¶ 28. As set forth above, the defense in this case was not “I don’t know what happened, but I didn’t do it.” With respect to the two most significant injuries — and the only ones specifically tied by timeline and opportunity to defendant — the defense offered plausible innocent explanations for the injuries that were arguably consistent with the physical and medical evidence. There was nothing “generic” about these two theories. Although they were bolstered by the generalized suggestion that the child had visual depth perception issues and was not coordinated, the theories did not depend on this more general theme.
¶ 59. In that regard, this case is on all fours with State v. Celis-Garcia, 344 S.W.3d 150 (Mo. 2011) (en banc). In that case, a court instructed the jury that it could convict the defendant if it concluded that she had engaged in hand-to-genital contact with the child victim during the specified date range. The jury had heard evidence of several different instances of such conduct at different locations and different times. The defendant argued on appeal that because some of the jurors may have convicted her for one act and some may have convicted for another, the court’s instructions rose to the level of plain error. The Missouri Supreme Court agreed that the instructions were error, “[bjecause it is impossible to determine whether the jury unanimously agreed on any one of these separate incidents.” Id. at 158. In considering whether the unpreserved error rose to the level of plain error, the court noted that the defense in this case did not simply argue that the victim’s story was fabricated. The court assigned significance to the fact that the defense identified and relied on distinct “inconsistencies and factual improbabilities” in the state’s evidence relating to each of several of the alleged instances rather than relying on a general denial. Id. at 158-59. Because the defense offered distinct, incident-specific arguments and defenses, the court concluded that it was “more likely that individual jurors convicted [the defendant] on the basis of different acts,” and the conviction amounted to “manifest injustice.” Id. at 159.
¶ 60. Again applying the standards articulated by the majority, I likewise conclude that the error in this case rises to the level of plain error. To satisfy plain error defendant must demonstrate that it is likely that some jurors convicted defendant on the basis *22 of one incident or set of incidents, while other jurors convicted him on the basis of another. See ante, ¶ 19 (citing In re Carter, 2004 VT 21, ¶ 24, 176 Vt. 322, 848 A.2d 281).
¶ 61. The majority suggests that because the jury could have found defendant guilty of child cruelty on the basis of the single black eye in connection with which it convicted defendant of domestic assault, there is no plain error here. Ante, ¶ 28. But the question here is not whether there was sufficient evidence to convict defendant of child cruelty on that basis; it is whether it is likely that one or more jurors voted to convict defendant of child cruelty on the basis of evidence other than the single black eye. On this record, that is highly likely.
¶ 62. The State’s argument to the jury on the child-cruelty charge did not rely on the single black eye. The deputy state’s attorney mentioned the single black eye and the two black eyes, but then focused her argument regarding the child-cruelty count on all of the other observed injuries. She discussed the petechia in great detail, identifying possible causes, and ruling out innocent explanations. She talked about the bruise on the child’s rib and argued that that was not a common place for a bruise. She pointed to the bruise on the child’s abdomen and asserted that it was an intentional injury with force. She pointed to the bruise on the child’s jaw line. She argued that throughout the time period in question defendant had repeated access to this child by himself and the child acquired unexplained bruises. The State’s closing pointed to the multiplicity of bruises as evidence of willfulness, but did not key on any specific acts. This is not a case in which we can infer based on the way the case was argued that the jury was relying on a particular instance, such as the single black eye, in convicting defendant of child cruelty.
¶ 68. At oral argument on appeal, the deputy state’s attorney, who was present at trial and had a firsthand sense of how this case was tried and received by the jury, opined with great confidence that the jury’s conviction of child cruelty was based on the evidence of petechial bruising, not on the single black eye. She pointed to the State’s closing argument below in support of this understanding.
¶ 64. The jury heard evidence of multiple distinct instances of unexplained or unusual bruising, many observed at different times and allegedly caused under different circumstances. Counsel’s arguments did not focus the jury on a particular instance of *23 alleged abuse. The majority and the State — relying on the same record — both believe that the jurors all relied on the same instance of abuse, but their surmise as to which instance of abuse that is are completely different. Under these circumstances, I conclude that it is unlikely that all twelve jurors relied on the same claims of abuse in convicting defendant, and that the error in this case rises to the level of plain error.

 Counsel for both sides seem to assume that the teacher testified that the child either told her about or showed her bruising on the abdomen at that time; the record does not support this assumption.