NOTICE:  This opinion is subject to motions for reargument under V.R.A.P. 40 as well as formal revision before publication in the Vermont Reports.  Readers are requested to notify the Reporter of Decisions by email at: JUD.Reporter@vermont.gov or by mail at: Vermont Supreme Court, 109 State Street, Montpelier, Vermont 05609-0801, of any errors in order that corrections may be made before this opinion goes to press.

2016 VT 104

No. 2016-016

| | |
|---|---|
| Dennis K. Chandler | Supreme Court |
| | |
| | On Appeal from |
| v. | Superior Court, Washington Unit, |
| | Civil Division |
| | |
| Andrew A. Pallito | June Term, 2016 |

Timothy B. Tomasi, J.

Dennis K. Chandler, Pro Se, Baldwin, Michigan, Plaintiff-Appellant.

William H. Sorrell, Attorney General, and David McLean, Assistant Attorney General, Montpelier, for Defendant-Appellee.

Matthew F. Valerio, Defender General, and Jill Paul Martin, Montpelier, for Amicus Curiae Defender General.

PRESENT:  Reiber, C.J., Dooley, Skoglund, Robinson and Eaton, JJ.

¶ 1.     **SKOGLUND, J.**   Plaintiff Dennis Chandler appeals a decision by the Superior Court, Washington Unit, Civil Division, denying his claim for summary judgment and granting the summary judgment motion filed by the Commissioner of the Vermont Department of Corrections.  Plaintiff claims that several statutes and policies enacted after his incarceration had the collective effect of retroactively increasing the length of his sentence and, as a result, violated the Ex Post Facto Clause of the U.S. Constitution.  We affirm, concluding that, because the statutes and policies did not retroactively alter or limit the Department's discretion over plaintiff's

treatment programming and early release, their application did not result in a longer sentence than under the prior statutes and policies.

¶ 2. On February 6, 1997, plaintiff pled guilty to one count of aggravated sexual assault, one kidnapping count, and one count of burglary. He was sentenced in April 1997 to twenty-five to sixty years. At his sentencing hearing, an employee of the Department described the sex offender treatment programming available to plaintiff and indicated that programming would not be automatically available to plaintiff prior to his minimum release date, but that plaintiff would be eligible to have an assessment. The employee also testified that, based on plaintiff's participation in the programming and the Department's assessment of that participation, the goal of the sex offender treatment program was for plaintiff to be released at his minimum incarceration date in 2013.

¶ 3. At the time of plaintiff's incarceration, only the parole statute provided for release at an offender's minimum release date—the remainder of the offender's sentence would be served on parole. Under that statute—28 V.S.A. § 501(a) (1997)—offenders with a minimum term were not eligible for parole until they served the minimum sentence, less any reduction in time for good behavior.[1] Section 501(c) of the same statute granted the Parole Board the discretionary authority to place such an offender on parole as long as the Board determined that, after considering factors like the nature of the offense and the Department's examination reports, the offender could be a

_____

[1] Specifically, the statute mandated that "[n]o inmate serving a sentence with a minimum term and a maximum term shall be released on parole until he has served the minimum term of the sentence, less any reductions for good behavior computed in accordance with section 811 [governing a facility administrator's required and discretionary ability to reduce time]." 1983, No. 89, § 2. This statute was amended in 1998 as follows: "[T]he inmate shall be eligible for parole consideration after the inmate has served the minimum term of the sentence less any reductions in term for good behavior." 1997, No. 148 (Adj. Sess.), § 59. The current version of the statute eliminates the reduction for good behavior and states that an "inmate shall be eligible for parole consideration after the inmate has served the minimum term of the sentence." 2001, No. 61, § 85.

2

law-abiding citizen.[2]  The furlough statute in effect was also completely discretionary, but authorized the Department's Commissioner to grant a maximum fifteen-day furlough for certain purposes, such as securing a residence or employment upon release.[3]

¶ 4.  Subsequently, in addition to the parole and basic furlough statutes, the Legislature added two new avenues for an offender to be released at his or her minimum release date: reintegration furlough was added in 2005 and conditional reentry was enacted in 2001.[4]  28 V.S.A.

---

[2]  In 1998, the Legislature removed this subsection and added 28 V.S.A. § 502a(b), which provided:

> An inmate shall be released on parole by the written order of the Parole Board if the Board determines:
> (1) the inmate is eligible for parole;
> (2) there is a reasonable probability that the inmate can be released without detriment to the community or to the inmate; and
> (3) the inmate is willing and capable of fulfilling the obligations of a law-abiding citizen.

1997, No. 148 (Adj. Sess.), § 61.  The current version of § 502a(b) retains this language. 2013, No. 96 (Adj. Sess.), § 187.

[3]  This broad discretionary authority to grant furlough allowed the Commissioner,

> to extend the limits of the place of confinement of an inmate at any correctional facility if in the judgment of the commissioner the inmate will honor his trust, by authorizing the inmate under prescribed conditions to visit a specifically designated place or places for a period not to exceed 15 days and return to the same facility.

1971, No. 199 (Adj. Sess.), § 20.

[4]  Plaintiff appears to base his claims on the classification system created by the Department to administer the conditional reentry program, not the Department directives that control reintegration furlough; however, given the similarity of the two policies' effects and statutory authority, we examine both programs in light of plaintiff's claims.  Compare Dep't of Corr., Agency of Human Servs., Conditional Re-Entry, Directive 317.15 (2002) [hereinafter Conditional Re-Entry, Directive 371.15], http://www.doc.state.vt.us/about/policies/rpd/correctional-services-301-550/371-375-programs-classification-and-case-planning/371.15-%20Directive-%20Conditional%20Re-entry.pdf [https://perma.cc/ZBP4-ACNW], with Dep't of Corr., Agency of Human Servs., Reintegration Furlough, Directive 371.26 (2011), http://www.doc.state.vt.us/about/policies/rpd/correctional-services-301-550/371-375-programs-

§ 808(a)(8) of the amended furlough statute gave the Department discretion to grant reintegration furlough to an offender in accordance with Department directives and rules adopted to evaluate the offender's fitness for reintegration. An offender in plaintiff's position could be granted reintegration furlough up to 90 days prior to the completion of his or her minimum sentence, a timeframe the Legislature extended to 180 days in 2011.[5] Similarly, the newly enacted conditional reentry statute, 28 V.S.A. § 723, allowed the Department discretionary authority to place an offender on conditional reentry status at the end of his or her minimum sentence. Supervision while on conditional reentry status was governed by another subsection of the amended furlough statute, § 808(a)(6). After 180 days of satisfactory supervision in the conditional reentry program, the Department could, in its sole discretion, submit a recommendation to the Parole Board that an offender convicted of offenses such as plaintiff's should be released on parole.[6] The Parole Board could take this recommendation into account at its discretion; however, the Board's discretion and the criteria for placing an offender in the conditional reentry program on parole remained the same as the prior version of 28 V.S.A. § 501.[7]

¶ 5.    In response to these legislative changes, the Department promulgated a series of directives to manage the conditional reentry and reintegration furlough programs; broadly speaking, Directive 371.15 governs conditional entry and Directive 371.26 controls the

classification-and-case-planning/371.26%20Reintegration%20Furlough.pdf [https://perma.cc/J58Z-WFY5].

[5] In 2011, the furlough statute was subdivided into multiple parts covering treatment, home confinement, and reintegration furlough. See 2011, No. 41, § 3a. The new reintegration furlough statute, § 808c, extended the time that an offender could be released prior to the expiration of his or her minimum release date to 180 days. Id.

[6] The listed offenses include all of plaintiff's offenses. See 28 V.S.A. § 725(2) (describing "listed offenses"); id. § 722(1)(2) (defining "listed crime" as any crime contained in 13 V.S.A. § 5301(7)).

[7] In 1998, the Legislature added 28 V.S.A. § 502a and shifted the criteria for granting parole to this new statute. 1997, No. 148 (Adj. Sess.), § 61.

reintegration furlough process. To administer the conditional reentry program, the Department created a three-tiered classification system that puts each offender on a custody level—Level A, B, or C—depending on the Department's validated risk assessment of each offender and the offender's program needs. An offender's level of custody informs the creation of an offender's case plan and also affects the reentry options available to an offender. Similarly, an offender's eligibility for release on reintegration furlough depends on factors like his or her compliance with the case plan, the offender's risk of reoffense, and the level of violence involved in the original crime. Unlike conditional reentry, however, the reintegration furlough directive does not explicitly require the Department to consider the offender's classification level; instead, the level implicitly affects the Department's decision to grant or deny reintegration furlough because an offender's ability to complete the programming and case plan—explicit factors in reintegration furlough— depend on his or her classification level. Ultimately, like conditional reentry decisions, reintegration furlough determinations are at the discretion of the Department.

¶ 6. As of 2008, plaintiff's case plan listed his Level of Services Inventory (LSI) risk at twenty-four and his combined reoffense and violence risk score at sixty-three.[8] Together, these validated assessments apparently placed plaintiff in custody Level B.[9] Level B offenders are

---

[8] Plaintiff's reoffense score of forty-three and his violence score of twenty corresponded to moderate risk of reoffense and low risk of violence in the Vermont Assessment of Sex Offender (VASOR) system. See R. McGrath & S. Hoke, Dep't of Corr., Agency of Human Servs., Vt. Assessment of Sex Offender Risk Manual 6 (2001), http://www.csom.org/pubs/VASOR.pdf [https://perma.cc/932V-XH5P].

[9] Directive 371.08 governs categorization of offenders convicted of the same offenses as plaintiff—aggravated sexual assault, kidnapping, and burglary. See generally Dep't of Corr., Agency of Human Servs., Classification of Offenders Convicted of Listed Offenses, Directive 371.08 (2002) [hereinafter Classification of Offenders Convicted of Listed Offenses, Directive 371.08], http://www.doc.state.vt.us/about/policies/rpd/correctional-services-301-550/371-375-programs-classification-and-case-planning/371.08-%20Directive-%20Classification%20of%20Offenders%20Convicted%20of%20Listed%20Offenses.pdf [https://perma.cc/T8NY-X7US]. We note, however, that nothing in the appellate record indicates that he was explicitly classified as a Level B offender and that the statute requiring the classification of certain listed offenses was not enacted until 1999, after he was sentenced. 1999,

eligible for sex offender treatment programming only after the Department considers a number of discretionary factors, such as the risk evident in the instant offense and the appropriateness of the specific programming methods.[10] Once a Level B offender is placed in a program and "satisfactorily" participates in the required treatment programming, conditional reentry will be granted at the offender's minimum release date, subject to additional discretionary exceptions, such as "risk to public safety."[11] In the plaintiff's case, his case plan or Offender Responsibility

---

No. 4, § 1; see generally Dep't of Corrs., Agency of Human Servs., Designation of Listed Offenses, Directive 371.09, §§ 4.2.7, 4.2.18 (2002), http://www.doc.state.vt.us/about/policies/rpd/correctional-services-301-550/371-375-programs-classification-and-case-planning/371.09-%20Directive-%20Designation%20of%20Listed%20Offenses.pdf [https://perma.cc/9B3J-6CPT].

[10] Under Directive 371.12, § 4.3, the Department determines the programming for Level A and B offenders using the following standard:

> The [Department] shall weigh several considerations in determining the appropriateness of a program for a specific offender, including (but not limited to) the criminogenic risk and need factors evident in the instant offenses, assessment data collected in various reports and the LSI, the appropriateness of specific methods, responsivity factors for the offender, overall risk of recidivism, special needs and accommodations, and other factors highlighted in the assessment.

Dep't of Corr., Agency of Human Servs., Participation Requirements for Offenders Convicted of Listed Offenses, Directive 371.12, § 4.3 (2002) [hereinafter Program Participation Requirements, Directive 371.12], http://www.doc.state.vt.us/about/policies/rpd/correctional-services-301-550/371-375-programs-classification-and-case-planning/371.12-%20Directive-%20Program%20Participation%20Requirements%20for%20Listed%20Offenders.pdf [https://perma.cc/5F6V-P3LR].

[11] If the Department determines, at the end of a Level B offender's programming, that he or she has not "yet satisfactorily participated in the number of months of treatment required by his/her sentence" he or she is not eligible for conditional reentry and, even if the Level B offender completed the programming, a facility Superintendent may recommend that reentry be delayed based on several factors, including "imminent risk to public safety." Conditional Re-Entry, Directive 371.15, supra, §§ 4.1, 4.2.

Plan (ORP) scheduled him to begin the Vermont Treatment Program for Sexual Abusers (VTPSA) on September 1, 2009, well in advance of his minimum release date.[12]

¶ 7. On July 1, 2009, the Legislature enacted 28 V.S.A. § 204b, which prohibited parole, furlough, or any other type of early release until seventy percent of a "high risk" offender's maximum sentence was completed. An offender was "high risk" under § 204b if, pursuant to 13 V.S.A. § 5411b, the offender was convicted of a listed crime and the Department designated the offender "high risk" while he or she served the sentence. The definition for "high risk" was drawn from § 5401(16), which defines "high risk" as "a high degree of dangerousness that a sex offender poses to others."[13]

¶ 8. On October 21, 2009, the Department reclassified plaintiff a Level C offender pursuant to Directive 371.10, the governing directive for some listed offenses. The brief case note accompanying the plaintiff's redesignation indicates that the Level C classification was based on the kidnapping of the victim, the sexual violence that occurred, the victim's vulnerability and emotional trauma, and the premeditated nature of the crime.[14] Unlike Level B offenders, the case

---

[12] This determination that plaintiff should be considered for VTPSA echoes the two other case plans contained in the trial court record; in both—one dated May 21, 1999, and the other dated July 9, 2003—the Department employee recommended that plaintiff be considered for VTPSA.

[13] The subsequent rule adopted by the Department to administer § 5411b largely repeats this requirement that an offender designated "high risk" for purposes of the internet registry possess a high degree of dangerousness to others, but does not list specific crimes that are per se high risk. Determination of High Risk and Failure to Comply with Treatment for Purposes of Sex Offender Internet Registry § 3.6, Code of Vt. Rules 13 130 025 [hereinafter Determination of High Risk, Rule 13 130 025], http://www.lexisnexis.com/hottopics/codeofvtrules/.

[14] In addition to these criteria, in order to be designated Level C, an offender must be evaluated on the Violence Risk Appraisal Guide (VRAG), which does not appear to have occurred prior to plaintiff's Level C classification. Dep't of Corr., Agency of Human Servs., Level C Designation of Offenders Convicted of Listed Offenses, Directive 371.10, § 4.2.D. (2002) [hereinafter Level C Designation of Offenders Convicted of Listed Offenses, Directive 371.10], http://www.doc.state.vt.us/about/policies/rpd/correctional-services-301-550/371-375-programs-classification-and-case-planning/371.10-%20Directive-%20Level%20C%20Designation.pdf

plans for Level C offenders are focused on long term confinement; under Directive 371.11, Level C offenders are not even eligible for treatment programming until the offender has served his or her minimum sentence. Then, to be eligible for conditional reentry, Level C offenders must complete any programming in an "exemplary fashion" consistent with public safety. Although the focus of Level C is long term confinement, Level C offenders are not entirely foreclosed from the conditional reentry and reintegration furlough programs; similarly, Level C offenders are still eligible for traditional parole.

¶ 9.     In February 12, 2010, the Department acknowledged in another case note that plaintiff's designation as a Level C offender was a mistake; instead of classifying plaintiff as a Level C offender, the Department had intended to merely evaluate plaintiff's appropriateness for Level C. The Department indicated that plaintiff's classification would be restored to Level B.

¶ 10.     Five days later, on February 17, 2010, another Department case note described in a "Programming Determination Decision" that the Department would base plaintiff's case plan on his anticipated maximum release date. The case note cited supporting factors like the seventy percent of maximum release date requirement articulated in 28 V.S.A. § 204b, plaintiff's "high risk" designation, his LSI score, and the offense severity. Apparently, this decision precluded plaintiff from participating in the programming necessary to be eligible for conditional reentry, particularly the VTPSA program scheduled in his 2008 case plan.

¶ 11.     Subsequently, in an April 21, 2010 letter, the Sex Offender Review Committee informed plaintiff that he would be designated a "high risk" sex offender under 13 V.S.A. § 5411b(b). Practically, this designation meant that plaintiff would be placed on the Sex Offender Internet Registry and that his sentence would be subjected to the seventy-percent rule; that is, he would be required to serve seventy percent of his maximum sentence under 28 V.S.A. § 204b. But

_____

[https://perma.cc/REQ3-2M4Y]. In this case, however, the plaintiff's classification has no bearing on the resolution of his ex post facto claim. See infra, ¶¶ 28-30.

in <u>Wood v. Pallito</u>, the trial court invalidated the seventy-percent rule's application to plaintiff, concluding that the rule violated the Ex Post Facto Clause. No. 947-12-09 Wncv, 2010 WL 4567692 (Vt. Super. Ct. Nov. 3, 2010), https://www.vermontjudiciary.org/20062010%20TCdecisioncvl/2010-11-8-5.pdf.

¶ 12. After this holding, plaintiff attempted to gain admission to the treatment programming described in his ORP case plan, particularly VTPSA. The Department reviewed plaintiff's case and, in a letter to plaintiff on February 16, 2011, declined to initiate the sex offender treatment program necessary for plaintiff to be conditionally reentered into the community. Specifically, the Department concluded that the "egregious nature of the offenses indicates that the potential risk of harm and risk to public safety would not be sufficiently mitigated by program participation" and explained that, rather than enrolling plaintiff in the rehabilitative program, the Department would review his case every two years.

¶ 13. In April 2013, plaintiff filed this action against the Department's Commissioner in the superior court. After extensive discovery and pre-trial motions, plaintiff filed a motion for summary judgment. Broadly stated, plaintiff argued that the mixture of statutes and administrative policies described above constituted a violation of the Ex Post Facto Clause because their retrospective application eliminated any "opportunity for him to obtain parole, or any other type of early release" and created a sufficient risk of increasing the punishment attached to his crimes. Specifically, plaintiff alleged that, after the superior court invalidated the seventy-percent rule's application to his sentence, the Department's decision to deny his participation in treatment programming effectively created the same result because, if he could not complete the required VTPSA programming, he could not be eligible for conditional reentry, reintegration furlough, or parole at his minimum release date.

¶ 14. The Commissioner filed a cross motion for summary judgment claiming that the statutory changes did not increase the measure of punishment associated with plaintiff's crimes

and that the Ex Post Facto Clause did not apply to the Department's programming decisions because they were rehabilitative and administrative in nature, not punitive.

¶ 15. In its analysis of the competing cross motions, the superior court focused on the Department's historically broad discretion over programming decisions, concluding that any change in the way the Department exercised its discretion did not amount to a legislative act subject to the Ex Post Facto Clause. Moreover, according to the court, the plaintiff provided no evidence that the Department applied some unwritten rule or policy to him that subjected his sentence to the same effect as the seventy-percent rule. Reasoning that because there was no evidence that a change in the law caused plaintiff to lose the opportunity for parole, the superior court granted the Commissioner's motion for summary judgment and denied plaintiff's cross motion. This appeal followed.

¶ 16. This Court reviews decisions denying or granting summary judgment by applying the same standard as the superior court. In re Carter, 2004 VT 21, ¶ 6, 176 Vt. 322, 848 A.2d 281. Under this standard, we view the evidence in the light most favorable to the nonmoving party; the superior court's decision will be affirmed if there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. Id.; see also V.R.C.P. 56(a).

¶ 17. On appeal, plaintiff repeats his broad argument that the Department's decision to deny him the opportunity to participate in programming amounted to an ex post facto violation, but his claim now has a slightly different emphasis. Specifically, the plaintiff argues that the Department's decision to deny his programming improperly relied on the same criteria it used to designate him "high risk" under 13 V.S.A. § 5411b(b) and to subject him to 28 V.S.A. § 204b's seventy-percent rule, despite the superior court's prior invalidation of this rule. Without this reliance on the "high risk" designation, plaintiff claims that he would be automatically eligible for the programming necessary for his reentry into the community. By contrast, the Department claims on appeal that the Department's discretionary classification and programming decisions are

not legislative acts subject to the Ex Post Facto Clause. Similarly, the Department argues that, because the programming and classification system was not promulgated through the Administrative Procedures Act, the policies do not raise ex post facto concerns.

¶ 18. Although we do not agree that the Department's classification and programming system is immune from ex post facto analysis, we affirm the superior court's decision granting the Commissioner's summary judgment motion and denying plaintiff's. After reviewing the evidence in the light most favorable to plaintiff, we conclude that, because the statutes and directives cited by plaintiff did not alter the Department's fundamental discretion over treatment programming and early release, their practical implementation did not create a sufficient risk that plaintiff would be incarcerated for a longer period than under the earlier statutes and rules. As a result, the Department is entitled to judgment as a matter of law.

¶ 19. Under the Ex Post Facto Clause, states may not retrospectively apply laws to a criminal defendant's prior actions, if that retroactive application disadvantages the affected offender. Lynce v. Mathis, 519 U.S. 433, 441 (1997); see U.S. Const. art. 1, § 10, cl. 1 ("No State shall . . . pass any . . . ex post facto Law."). To disadvantage an offender, the law must "retroactively alter the definition of crimes or increase the punishment for criminal acts." Cal. Dep't of Corr. v. Morales, 514 U.S. 499, 504 (1995) (quotation omitted). Specifically, to run afoul of the clause, the U.S. Supreme Court has long made clear that a law must fit within the four categories described in Calder v. Bull, 3 U.S. 386, 390 (1798).[15] See, e.g., Carmell v. Texas, 529

---

[15] In Calder, Justice Chase described the four categories as follows:

> I will state what laws I consider ex post facto laws, within the words and the intent of the prohibition. 1st. Every law that makes an action, done before the passing of the law, and which was innocent when done, criminal; and punishes such action. 2nd. Every law that aggravates a crime, or makes it greater than it was, when committed. 3rd. Every law that changes the punishment, and inflicts a greater punishment, than the law annexed to the crime, when committed. 4th. Every law that alters the legal rules of

11

U.S. 513, 539 (2000) (noting prior precedent holding "it was a mistake to stray beyond Calder's four categories").

¶ 20. In this case, plaintiff's contention falls within Calder's third category, which prohibits the retroactive application of "[e]very law that changes the punishment, and inflicts a greater punishment, than the law annexed to the crime, when committed." Calder, 3 U.S. at 390. A law retroactively increases punishment if, objectively analyzed, the legislative change "created a sufficient risk of increasing the measure of punishment attached to the covered crimes." Garner v. Jones, 529 U.S. 244, 250 (2000) (quotation omitted); see also Girouard v. Hoffman, 2009 VT 66, ¶ 8, 186 Vt. 153, 981 A.2d 419. No exact formula exists for determining whether a change in the law affects punishment sufficiently enough to violate the Ex Post Facto Clause; however, a "speculative and attenuated possibility" of increasing the punishment does not trigger an ex post facto violation. Morales, 514 U.S. at 509.

¶ 21. In the context of an offender's release date, the U.S. Supreme Court has noted that whether a change in a law creates a sufficient risk of increasing a plaintiff's punishment "is often a question of particular difficulty when the discretion vested in a parole board is taken into account." Garner, 529 U.S. at 250. In Morales, for example, the Supreme Court held that a statute that changed the frequency of parole reconsideration hearings for certain violent offenders from every year to every three years did not violate the Ex Post Facto Clause. 514 U.S. at 508. In support of this holding, the Supreme Court noted that the question was one of degree that could not be reduced to a "single formula" and concluded that, under California's parole structure, the amendment did not alter the statutory standards for determining either the initial date for parole

---

evidence, and receives less, or different, testimony, than the law required at the time of the commission of the offence, in order to convict the offender.

3 U.S. 386, 390 (1798).

12

eligibility or an inmate's suitability for parole. Id. at 507. Instead, the amendment merely altered the method to be followed in fixing a parole release date, "rather than changing the sentencing range applicable to covered crimes." Id. at 507-08; cf. Peugh v. United States, __ U.S. __, 133 S. Ct. 2072, 2084 (2013) (holding that retroactive application of advisory sentencing guidelines violated Ex Post Facto Clause because guidelines created sufficient risk of increased sentencing range).

¶ 22. Subsequently, the U.S. Supreme Court directly addressed a state statutory scheme providing a parole board with great discretion to determine whether an offender should receive early release. Garner, 529 U.S. 244. In Garner, a new Georgia law required the Georgia parole board to reconsider parole for all inmates serving life sentences every eight years, instead of every three years, as the previous law required. Id. at 247. As with the Vermont statute in effect when plaintiff was sentenced, the Georgia parole scheme as a whole invested great discretion in the parole board to determine whether an offender could be released on parole.[16]

---

[16] The Vermont statute in effect when plaintiff was convicted is remarkably similar to the statute at issue in Garner, Ga. Code Ann. § 42-9-42(c) (1997):

> No inmate shall be placed on parole until and unless the board shall find that there is reasonable probability that, if he is so released, he will live and conduct himself as a respectable and law-abiding person and that his release will be compatible with his own welfare and the welfare of society. Furthermore, no person shall be released on pardon or placed on parole unless and until the board is satisfied that he will be suitably employed in self-sustaining employment or that he will not become a public charge.

See also Ga. Code Ann. § 42-9-43 (1997) (listing information parole board should consider, including wardens' reports, results of physical and mental examinations, and reports regarding prisoners' performance in educational programs); cf. 28 V.S.A. § 502a(b) (1997) ("An inmate shall be released on parole by the written order of the parole board if the board determines . . . there is a reasonable probability that the inmate can be released without detriment to the community or to the inmate; and . . . the inmate is willing and capable of fulfilling the obligations of a law-abiding citizen.").

13

¶ 23. In its analysis, the Supreme Court first reiterated that the relevant question was whether the new statute created a significant risk of prolonging the prisoner's incarceration, emphasizing "that not every retroactive procedural change creating a risk of affecting an inmate's terms or conditions of confinement is prohibited." Id. at 250. In determining whether that sufficient risk exists, the Supreme Court noted that "the presence of discretion does not displace the protections of the Ex Post Facto Clause." Id. at 253. But the Supreme Court also acknowledged that, in the context of parole, discretion allows a parole board to adapt to "[n]ew insights into the accuracy of predictions about the offense and the risk of recidivism consequent upon the offender's release, along with a complex of other factors." Id. According to the Supreme Court, that is exactly what Georgia's parole scheme accomplished. Id. In fact, in conjunction with two other statutes that qualified the law at issue, the amendment permitted Georgia's parole board "a more careful and accurate exercise of the discretion [it] had from the outset." Id. at 254. More important, although this more flexible and accurate system "seem[ed] certain to result in some prisoners serving extended periods of incarceration," id. at 255 (quotation omitted), the "significant risk" test nevertheless required the prisoner to meet a more demanding standard. Ultimately, the Supreme Court concluded that the prisoner had not met this more rigorous burden, holding that, "[w]hen the rule does not by its own terms show a significant risk, the [prisoner] must demonstrate, by evidence drawn from the rule's practical implementation by the agency charged with exercising discretion, that its retroactive application will result in a longer period of incarceration than under the earlier rule." Id. at 255.

¶ 24. Plaintiff fails to meet this burden here.

¶ 25. First, insofar as plaintiff's claims rest on the application of 13 V.S.A. § 5441b and 28 V.S.A. § 204b to his sentence length, no evidence indicates that either statute created a significant risk that plaintiff would be incarcerated for a longer period of time than his original sentence. By § 5441b's plain terms, the Department must designate an offender "high-risk" for

14

the sole purpose of increasing public access "to his or her status as a sex offender and related information, including Internet access." 13 V.S.A. § 5411b(a). Similarly, although the enactment of the seventy-percent rule in 13 V.S.A. § 204b could have retroactively increased plaintiff's minimum sentence,[17] after the superior court's decision holding that § 204b violated the Ex Post Facto Clause, that statute had no legal effect on the length of plaintiff's incarceration. Simply stated, neither statute increased nor even applied to plaintiff's length of incarceration and, as a result, neither statute constituted an ex post facto violation.

¶ 26.    As a result, instead of relying on the plain terms of 13 V.S.A. § 5441b and 28 V.S.A. § 204b, plaintiff endeavors to prove that the Department's decision to deny his sexual offender treatment programming improperly employed the same criteria as the determinations under § 204b and § 5441b, which then led to the same effect as the seventy-percent rule. For support, he points to the February 16, 2011 letter denying his participation in the programming as well as the February 17, 2010 case note listing the Department's decision to "program toward a maximum release date" and citing factors like the seventy-percent rule, his designation as "high risk," his LSI score, and the offense severity. In particular, he seizes on the language in the Department's February 17 letter that analyzes the severity of the original offense and concludes that his "potential risk of harm and risk to public safety" would not be mitigated by program participation, a

---

[17]    Without making a determinative decision, we note that the practical application of § 204b to plaintiff presents an instructive comparison to the case at bar. Unlike the current case, if § 204b's seventy-percent rule had been applied to plaintiff, the statute's plain terms would have retroactively increased the length of plaintiff's minimum sentence. This, presumably, would violate the Ex Post Facto Clause. Peugh, __ U.S. at __, 133 S.Ct. at 2084 (holding that retroactive application of advisory sentencing guidelines violated Ex Post Facto Clause because guidelines increased minimum sentencing range); see also Puckett v. Abels, 684 So. 2d 671, 678 (Miss. 1996) (holding that statutory amendment requiring eighty-five percent of sentence be served before prisoner is eligible for parole is ex post facto clause violation). By contrast, plaintiff alleges in this case that a number of changes to the discretionary statutes and administrative directives created the same effect as the plain terms of § 204b's language, a claim we hold to be too speculative because the statutes and directives cited by plaintiff did not change the Department's fundamental discretion over his programing. See infra, ¶¶ 28-30.

conclusion he claims demonstrates an improper reliance on the same "findings" used to categorize him as "high risk" for the Sex Offender Registry. Without this reliance on the "high risk" designation, plaintiff claims that he would be a Level B offender and, under Directive 371.15, automatically eligible for the programming necessary for his reentry into the community.[18]

¶ 27. But plaintiff's claim of improper reliance on "findings" is too attenuated and speculative to establish an ex post facto violation. See Morales, 514 U.S. at 508-09 ("These and countless other changes might create some speculative, attenuated risk of affecting a prisoner's actual term of confinement by making it more difficult for him to make a persuasive case for early release, but that fact alone cannot end the matter for ex post facto purposes."). Collectively, the current statutes governing reentry provide the Department with the discretion to make programming decisions for offenders and to determine their eligibility for early release, as long as that discretion is tempered by the potential risk to the public and risk of reoffense. See, e.g., 28 V.S.A. § 721 (release on conditional reentry program); id. § 808c(a)(1) (release on reintegration furlough), id. § 502a(b)(2) (release on parole). This concern for the potential risks posed by an offender is echoed in the Department's directives; for example, the three-tiered conditional reentry

---

[18] Both plaintiff and amicus curiae claim that plaintiff has been categorized as a Level C offender, but we note that no evidence in the record establishes this fact. It is true that the Department's February 16, 2011 letter denied his participation in treatment programming, but the letter does not explicitly assign plaintiff a category level. To the contrary, the letter indicates that all of plaintiff's "risk assessment scores are in the moderate range," including his LSI score. Despite these moderate scores, the letter concludes that, based on the Department's review of the offense details, programming would not mitigate the potential risk of harm or risk to public safety. This analysis and conclusion is partially consistent with the directed assessments in plaintiff's case plan and the program referral process for Level A and B offenders described in the Program Participation Requirements, supra, Directive 371.12 § 4.3. On the other hand, the two-year review plan described in the letter is also consistent with a Level C classification. See Level C Designation of Offenders Convicted of Listed Offenses, Directive 371.10, supra, § 4.4. Similarly, the April 21, 2010 letter did not classify plaintiff as a Level C offender for purposes of conditional reentry; rather, the "high risk" designation in this letter plainly relates to plaintiff's placement on the Sex Offender Internet Registry. Regardless of the classification level, however, plaintiff's claim is too attenuated to demonstrate a significant risk that the length of his incarceration is greater than under the earlier rules. See infra, ¶¶ 29-31.

classification system uses evidence-based methods like LSI and VASOR to evaluate an offender's risk of violence to the community before categorizing an offender. See Classification of Offenders Convicted of Listed Offenses, Directive 371.08, supra, §§ 2.1.2, 4.3. Similarly, to be placed in a sex offender treatment program, the Department analyzes criteria like the "risk and need factors evident in the instant offenses." Program Participation Requirements, Directive 371.12, supra, § 4.3 (emphasis added).

¶ 28. The mere fact that 13 V.S.A. § 5441b uses similar language and "findings" to place offenders on the Sex Offender Internet Registry does not demonstrate that the Department's decision to delay plaintiff's programming and subsequent early release was an ex post facto violation. See 13 V.S.A. § 5401(16) (" 'High-risk' means a high degree of dangerousness that a sex offender poses to others. Dangerousness includes the probability of a sexual reoffense."). Practically speaking, the statutes governing treatment programming and the reentry system operate on a different track than 13 V.S.A. § 5411b, which governs placement on the Sex Offender Internet Registry after reentry. See Determination of High Risk, Rule 13 130 025, supra, § 2 (indicating Department's focus under § 5411b is determining whether offender should be placed on Sex Offender Internet Registry and terms of that placement). Any similarity between the Department's analysis of plaintiff's programming and § 5411b is a product of the Legislature's intention to minimize the risk to the public and its intention to notify the public of that risk in all aspects of offender reintegration. As a result, the use of similar language or "findings" to delay plaintiff's programming and to evaluate plaintiff for the sex offender registry was not improper and, more important, is far too speculative to establish an ex post facto violation.

¶ 29. Moreover, even if we accepted as true plaintiff's argument that the Department's reliance on the improper "findings" led the Department to categorize him as a Level C offender—consequently denying plaintiff's treatment programming and preventing his early release—plaintiff fails to demonstrate how the retroactively applied statutes and administrative directives

17

altered or eliminated the Department's fundamental discretion over plaintiff's treatment programming and led to an increase in his sentence.

¶ 30. At the time of his incarceration, plaintiff could be released only for a maximum fifteen-day furlough for certain reasons, none of which included reintegration furlough or conditional reentry. 1971, No. 199 (Adj. Sess.), § 20. Further, he was not eligible for parole until the expiration of his minimum sentence, less any reductions for good behavior. 28 V.S.A. § 501(a) (1997). The parole statute gave broad discretion to the Parole Board to grant parole, after considering whether there was a "reasonable probability that the inmate be released without detriment to the community or to himself." Id. If the Board did not grant parole, the Board was required to review an offender's parole eligibility every six months, considering factors like "the circumstances of the inmate's offense, his previous social history and criminal record, any presentence report, . . . and the reports of such physical and mental examinations as have been conducted." Id. § 501(c) (emphasis added). At each review, after considering these factors, the Board had no obligation to release plaintiff to parole. Similarly, as the Department's employee testified at plaintiff's sentencing hearing, plaintiff was entitled only to be assessed for the sex offender treatment program, he was not entitled to actually be placed in the sex offender treatment program. Thus, even though plaintiff was eligible for parole after twenty-five years, any early release was still dependent on the Department's discretion, as was any participation in treatment programming.

¶ 31. The subsequent enactment of the conditional reentry and reintegration furlough statutes did not alter this fact, because the Department's fundamental discretion over plaintiff's treatment programming did not change. Instead, as in Garner, the enactment of the conditional reentry and reintegration furlough statutes allowed the Department to incorporate "new insights into the accuracy of predictions about the offense and the risk of recidivism consequent upon the offender's release, along with a complex of other factors." Garner, 529 U.S. at 253. This is evident

18

from the text of the new statutes, which still provided the Department with discretion over release. See, e.g., 28 V.S.A. § 721 ("An offender . . . may be placed in the community . . . if the department is satisfied that the offender is demonstrating progress in his or her reentry programs and that the offender does not present an unreasonable risk to his or her victims or to the community at large."); id. § 808c(c) ("The Commissioner may authorize reintegration furlough."); id. § 502a(b)(2) (conditioning grant of parole on discretionary factors like "a reasonable probability that the inmate can be released without detriment to the community or to the inmate"). And it is evident from the detailed use of evidence-based methods like LSI and VASOR to evaluate an offender's risk of violence to the community before categorizing an offender. See Classification of Offenders Convicted of Listed Offenses, Directive 371.08, supra, §§ 2.1.2, 4.3. Thus, despite the statutory and administrative changes, the basic structure of plaintiff's sentencing range did not change, nor did the Department's discretion over his programming. Rather, the newly enacted statutes and the Department's directives simply evince "a more careful and accurate exercise of the discretion the Board has had from the outset." Garner, 529 U.S. at 254. Although this more flexible and accurate system "seems certain to result in some prisoners serving extended periods of incarceration," id. at 255 (quotation omitted), we conclude that the "significant risk" test requires a more concrete demonstration that the statutes and directives retroactively increased plaintiff's sentencing range.

¶ 32. We are not persuaded by plaintiff's reliance on In re Shaimas, 2008 VT 82, 184 Vt. 580, 958 A.2d 646 (mem.). In Shaimas, we upheld the trial court's conclusion that the petitioner's misunderstanding of the availability of treatment programming and early release did not invalidate his plea deal. Id. ¶ 9. To the limited extent a case involving a plea bargain applies to an ex post facto claim, we note that this Court acknowledged in Shaimas that "information concerning parole eligibility is inherently imprecise owing to any number of variables such as the plaintiff's conduct while in prison, changes in the makeup or philosophy of parole boards, and changes in the law." Id. (quotation omitted). Thus, although it is true that the new statutes and directives attempt to

make this information more accurate, they do not alter the Department's fundamental discretion in a manner that could retroactively increase plaintiff's quantum of punishment.

¶ 33. Similarly, this is not a case where plaintiff's previous eligibility for early release was eliminated by the new statutes and directives. See generally Girourard, 2009 VT 66. In Girourard, the plaintiff's sentence contained no minimum term; then, after his incarceration, a 2001 amendment conditioned all inmates' reintegration furlough on completion of a minimum prison term. The plaintiff argued that his lack of a minimum sentence made him ineligible for furlough and, as a result, his likelihood of parole was also significantly decreased because the Department's policy was to grant parole only if an offender had participated in furlough. We agreed with the plaintiff, concluding that the passage of the reintegration furlough statute could have eliminated an opportunity for parole that previously existed for the plaintiff. Id. ¶¶ 10, 12. As a result, we reversed the trial court's decision to grant the Department's motion to dismiss and remanded for the trial court to determine if, in fact, the Department's policy was to deny parole if an offender had not participated in furlough. Id. ¶ 12. Here, we examine the facts at a later stage in the proceedings, after the cross motions for summary judgment. From the more developed factual record, it is clear that the Department has long had the discretion to determine the timing of plaintiff's treatment programming; the new statutes and administrative directives did not alter this fact.

¶ 34. To be clear, the mere fact that the Department has the discretion to determine whether plaintiff may participate in programming does not preclude plaintiff's ex post facto claim. "[T]he presence of discretion does not displace the protections of the Ex Post Facto Clause," Garner, 529 U.S. at 253; rather, nothing suggests that the Department's fundamental discretion over the timing of plaintiff's programming has been changed by a statute or directive since the date of plaintiff's incarceration. Likewise, we reject the Department's arguments that the directives and policies of the Department may not be examined for ex post facto violations because

20

they are not legislative acts. "At a minimum, policy statements, along with the [Department's] actual practices, provide important instruction as to how the [Department] interprets its enabling statute and regulations, and therefore whether, as a matter of fact, the [legislative acts] created a significant risk of increased punishment." Garner, 529 U.S. at 256; Girourard, 2009 VT 66, ¶ 12 (remanding for trial court to determine if, in fact, Department's policy was to deny parole if offender had not participated in furlough). In this case, plaintiff's claim fails because he can point to no statute or directive that retroactively removed or limited the Department's discretion over his treatment programming and that consequently resulted in a longer period of incarceration. Garner, 529 U.S. at 255.

¶ 35. Finally, we briefly address the argument advanced by amicus curiae, the Office of the Defender General. The Defender General claims that, since plaintiff's conviction, Vermont has adopted a "hard line" towards sentencing and treating sex offenders because of negative publicity stemming from the kidnapping, rape, and murder of Brooke Bennett.[19] According to the Defender General, this negative publicity not only spurred the Legislature to impose stricter sentencing guidelines, but also prompted the Department to pursue an unwritten policy of using any means necessary to increase sex offenders' quanta of punishment. The Defender General claims that this pressure, coupled with the series of statutory amendments described above, increased plaintiff's punishment and constituted an ex post facto violation. In an attempt to support this claim, the Defender General alleges that two material facts remain in dispute: whether any written or unwritten rule exists regarding offender suitability for programming and whether the sentencing court considered the impact of the Department's treatment plan when imposing plaintiff's sentence.

---

[19] In March 2009, the Legislature responded to public pressure by passing "Brooke's Law," which stiffened penalties against child sex offenders. See "Brooke's Law" Signed by Governor Wednesday, WPTZ.com (March 4, 2009), http://www.wptz.com/-Brooke-s-Law-Signed-By-Governor-Wednesday/5778046 [https://perma.cc/9EZV-GGDG].

¶ 36.     We fail to see how either alleged material fact remains in dispute, much less how either impacts our decision.  As indicated above, there are many written directives that govern how offenders are categorized for treatment programming; nevertheless, all of these directives plainly preserve the discretion the Department has always had over plaintiff's treatment programming and early release.  Garner, 529 U.S. at 254.  Moreover, to the extent the Defender General relies on an "unwritten policy" adopted in response to public pressure, we find the claim that public pressure increased plaintiff's incarceration a far too "speculative and attenuated possibility."  Morales, 514 U.S. at 509.  Finally, it is irrelevant to the ex post facto inquiry if the sentencing court considered the impact of the treatment plan when imposing plaintiff's sentence.  The question is whether a subsequent law, retroactively implemented by the Department, "increas[ed] the measure of punishment attached to the covered crimes."  Garner, 529 U.S. at 250 (quotation omitted).  The factors the sentencing court used to arrive at the original measure of punishment attached to the crime do not bear on this comparative analysis.  Rather, a plaintiff must demonstrate the practical implementation of the new statutes and rules resulted "in a longer period of incarceration than under the earlier rule."  Id. at 255.  In this case, plaintiff fails to make this demonstration.

Affirmed.

FOR THE COURT:

_____
Associate Justice

22