*Bruyette v. Menard*, 504-8-14 Wncv (Teachout, J., Mar. 21, 2017)
[The text of this Vermont trial court opinion is unofficial. It has been reformatted from the original. The accuracy of the text and the accompanying data included in the Vermont trial court opinion database is not guaranteed.]

**STATE OF VERMONT**

| | |
|---|---|
| **SUPERIOR COURT** | **CIVIL DIVISION** |
| **Washington Unit** | **Docket No. 504-8-14 Wncv** |

**JOSEPH BRUYETTE**
        **Plaintiff**

        **v.**

**LISA MENARD, Commissioner,**
**Vermont Department of Corrections**
        **Defendant**

**DECISION**
**DOC's Motion for Summary Judgment**

Joseph Bruyette, an inmate in the custody of the Commissioner of the Department of Corrections, asserts in his amended complaint that the Department of Corrections has abused its discretion by classifying him at Level C, which substantially delays programming and early release opportunities, and by improperly considering the use of a weapon in the commission of a crime and his refusals to supply DNA samples in 1998, 2001, and 2003.[1]  In his original complaint, he also asserts generally—without providing any details—that his Level C classification may have been the result of retaliation by certain correctional officers and because classification criteria were not followed.

The State has filed a motion for summary judgment.  It argues that, though Mr. Bruyette filed a grievance before filing this case, and exhausted administrative remedies in relation to that grievance, that grievance did not address the issues he raises in this case.  Regarding the issues raised here, it argues, he did not file a grievance and he has not exhausted administrative remedies.  It further argues that this case is out of time under Rule 75(c) because he filed it many months after the final step of the grievance policy, a decision by the Commissioner, for the grievance(s) that he did file.  The State further argues that the DOC's Level C determination is unreviewable, the court lacks jurisdiction to review for any abuse of discretion, and, in any event, there was no abuse of discretion: the DOC relied on a police affidavit regarding the use of a weapon and there is no evidence that anyone ever considered anything about DNA samples in relation to the Level C classification.

In opposition, Mr. Bruyette argues that: (1) his grievance was general enough to encompass all issues raised in this case; (2) he did not receive the Commissioner's grievance determination until many months after it was issued, and then filed this action in a timely manner once he did receive it; (3) Level C determinations are reviewable for *both* mandamus and

---

[1] He also claimed a violation of the Ex Post Facto Clause of the United States Constitution, U.S. Const. art. I, § 10, based on the DOC's adoption and implementation of its Level C classification.  He withdrew this claim after the Vermont Supreme Court rejected a substantially similar claim in *Chandler v. Pallito*, 2016 VT 104, 2016 WL 5339553.

certiorari relief pursuant to Rule 75; and (4) the material facts are disputed (addressed below). Notably, he does not dispute that the DOC, in classifying him at Level C, relied upon a police affidavit regarding the use of a weapon and never considered anything relating to DNA samples.

*The grievances*

Mr. Bruyette apparently filed two grievances on the same day, September 26, 2013. In the first, he complained as follows:

> This is in regards to the assessment of a Level - C, which is incorrect to use without my ability to program prior to my window on my minimum sentence. The Department is changing my sentence structure and would be incorrect to do before I'm able to participate in program [*sic*] prior to minimum sentence and completely changes my 1990 Classification I relied on.

He requested that the Level C classification be "expunged" so that he could begin his programming in time to be eligible for early release at his minimum as he had thought would be the case before he was classified at Level C. This grievance clearly relates to Mr. Bruyette's belief that his prior classification *entitled* him to begin his programming in time for early release at his minimum. This belief turned into the ex post facto claim that appeared in his amended complaint but then was withdrawn following the Supreme Court's decision in *Chandler v. Pallito*, 2016 VT 104, 2016 WL 5339553. It is unclear whether this grievance ever was pursued and exhausted, but it is no longer relevant to this case.

In the second grievance, he complained as follows:

> This matter is to the LSI-R score of a 36 and where I had not been present, that the assessment was done without my input. I do not [believe] the score is correct and it seems someone else did the test. I was classified in 1990 and the Department said this is what to expect.

He proposed as a solution: "I wish to have a re-assessment done to have a fair, accurate scoring with my participation and input. The Department honor [*sic*] the 1990 Classification." Plainly, he reiterated his desire to have his previous classification level, and objected to how his LSI-R score was determined because he was not present for it and was unable to provide input.

Mr. Bruyette's appeal reached the "corrections executive" level (the last step before the commissioner), but he appealed to the commissioner before receiving the response from the corrections executive. In his appeal to the commissioner, he wrote, in substance: "I do not believe the score and how it's been applied to me" and referred to his earlier grievance forms. In other words, he was pressing his claim that he was not present for the LSI-R evaluation.

Then the corrections executive responded, in relevant part, as follows: "Your LSI-R was updated on September 27, 2013. If this was not done with an in-person interview I will ask the Out of State Unit Correctional Services Specialist Supervisor to schedule a time to have it redone to include an in-person interview." Nothing in record reveals what happened next, but this

2

response from the corrections executive appears to have directly answered Mr. Bruyette's concern.

The commissioner then added this:

I have received your "Decision Appeal to Commissioner". As issue is your Level C designation and your belief that you should be allowed to program prior to your minimum and have the Level C designation removed. I have had the Department's Policy Development and Offender Due Process Administrator, David Turner look into these matters. Here is what we have found out:

The Level C designation is reserved for those inmates whose listed offenses are egregiously harmful and who are assessed as high risk for future violent criminality. Your case was centrally staffed in January of 2007. Given the level of violence including sexual violence used during your offense, the fact that you used a weapon in the commission of the crime, and the harm that was inflicted on the victim was substantial, you meet the criteria for a Level C designation. At the time of the staffing it was determined that your case plan would include your eligibility to program 5 years prior to your maximum release date. Your case will be reviewed by the facility and central office classification review team upon the expiration of the minimum sentence and every two years thereafter. This will help to determine how your case should proceed and if your case planning might require any adjustments.

Letter from Commissioner Pallito to Mr. Bruyette (dated Jan. 6, 2014). Mr. Bruyette claims that he did not actually receive the letter until sometime within 30 days (ostensibly complying with Rule 75(c)) of when he filed this case on August 29, 2014.

Mr. Bruyette's grievances raised two matters only—his belief that he had a binding right to his prior classification level and his objection that one of his LSI-R evaluations was conducted in his absence. The former issue evolved into his ex post facto claim in this case and then was withdrawn. Mr. Bruyette did not have a right to any particular classification level. He was mistaken in believing otherwise. As for the latter issue, the corrections executive responded to the concern expressed directly by offering that if he had not been present for the LSI-R, it could be redone with his presence.

There is no mention anywhere in this grievance history of retaliation from corrections officials or improper reliance on evidence of the use of a weapon or DNA samples.

*Retaliation*

The Vermont Supreme Court has made clear that "retaliation claims by prisoners are prone to abuse." *In re Girouard*, 2014 VT 75, ¶ 16, 197 Vt. 162. While retaliation claims supported by "specific factual allegations" sufficient to show a prima facie case of a constitutional violation may survive the pleading stage, "'wholly conclusory' complaints alleging retaliation can be dismissed at the pleading stage." *Id*. In this case, not only does the

3

grievance history lack any reference to retaliation, even now at the summary judgment stage the references to retaliation in the record of this case are purely conclusory. There is no cognizable retaliation claim in this case.

*Use of a weapon and DNA samples*

Nothing in the grievance history reveals any reference to improper reliance on the use of a weapon or willingness to provide DNA samples. Nevertheless, in its summary judgment motion, the State plainly shows that a police affidavit describing the use of a weapon was relied upon for that evidence and that there is no indication whatsoever that DNA played any role in Mr. Bruyette's Level C classification. In opposition to summary judgment, Mr. Bruyette does not respond to these showings. He appears to have dropped these claims at this point.

*Asserted disputes of fact*

Other than procedural and jurisdictional arguments, and the issues described above, Mr. Bruyette argues that several purported disputes of fact should prevent summary judgment. These "disputes" evidently are intended to point toward some abuse of discretion or failure to follow Level C classification policies. They include: (1) three documents related to the case staffing in 2007 that resulted in the Level C classification do not have a VRAG score written on them; (2) VRAG testing that was conducted at some point later was "rushed"; (3) VRAG testing was not conducted by a trained forensic psychologist; (4) Mr. Bruyette's LSI-R score has come down over the years and he self-reports that his caseworker told him it is now below the level required for a Level-C classification; and (5) the 2007 case staffing resulting in the Level C classification improperly relied on convictions that the Vermont Supreme Court vacated. Not one of these matters was mentioned anywhere in the grievance history, the complaint, or the amended complaint.

Briefly, the mere omission of a VRAG score on some documents from 2007 is insufficient to demonstrate that no VRAG score then existed and that it was not high enough for Level C purposes and the evidence on this issue not more well developed. It also does not demonstrate that after 2007 a qualifying VRAG score did not (and does not) exist. In fact, the DOC reported in discovery that Mr. Bruyette's VRAG score is 8, which is sufficient for Level C purposes. Defendant's Reponses to Plaintiff's First Set of Interrogatories ¶ 15(b).

It is unclear whether the VRAG testing that Mr. Bruyette claims was "rushed" was the same testing that resulted in his score of 8. In any event, there is no explanation of why, if he thought there was a problem with the manner in which the test was performed, that he did not complain or file a grievance about it. When he complained about the conduct of one of his LSI-R evaluations, the Department was responsive.

Mr. Bruyette squarely asserts in his statement of disputed facts that his VRAG testing was not conducted by a trained forensic psychologist. He cites no evidence in the record for this allegation. In fact, insofar as the record goes, it shows that he has no idea who conducted the test. In other words, there is at most an absence of evidence on this issue. That absence of evidence is insufficient to permit the inference Mr. Bruyette asserts as fact.

4

He also alleges that his LSI-R score has come down over the years and the mere fact that it has done so raises a question about whether it has been computed correctly. It might raise that question if the test produces a static result that is not supposed to change over time. There is no showing that this is so, however.

Mr. Bruyette's assertion that his current LSI-R score is 22, below the number required for Level C, is supported only by his hearsay allegation that a caseworker may have said so. No actual test result is in evidence.

Finally, he claims that the 2007 case staffing resulting in his Level C classification improperly relied upon convictions that the Vermont Supreme Court vacated, citing *In re Bruyette*, 150 Vt. 557 (1988). In that case, Mr. Bruyette had pleaded guilty to breaking and entering, grand larceny, and assault and robbery in 1978. He later collaterally attacked the convictions due to ineffective assistance related to his counsel's failure to attempt to suppress an admission obtained in violation of his *Miranda* rights. The trial court found no violation but the Supreme Court did. The mandate from that case is as follows: "Petitioner's convictions and sentences are vacated, and *leave is granted for petitioner to withdraw his guilty pleas*." *Id*. at 562 (original italics removed; emphasis added). Nothing in the record of this case explains what happened next. It also is not clear whether the vacated convictions in fact are listed in Mr. Bruyette's extensive criminal history as described in the report of the 2007 case staffing. In all events, however, that report clearly shows that the focus of the case staffing was on the sexual assault that is at the heart of his Level C classification, not the 1978 crimes. There is no indication whatsoever that the case staffing even considered his 1978 plea to breaking and entering, grand larceny, and assault and robbery, or whatever happened after those convictions were vacated. It is not even clear whether he withdrew his 1978 plea after the Court permitted him to do so.

For all these issues, the record is poorly developed, the inferences drawn by Mr. Bruyette are not well supported, DOC never had a fair chance to respond administratively, and the issues do not appear in the complaint or amended complaint.

*Exhaustion*

This case shows why exhaustion of administrative remedies is required and important. The "exhaustion doctrine is designed to ensure that a grievance is fully explored and litigated before the administrative body possessing the pertinent experience and expertise in the subject area; the doctrine thus serves to preserve the authority of the administrative body, and to promote judicial efficiency." *Rennie v. State*, 171 Vt. 584, 585 (2000). When administrative remedies are established by statute or regulation, the longstanding rule is that a party *must* pursue or "exhaust" all such remedies before turning to the courts for relief. *Jordan v. State Agency of Transp.*, 166 Vt. 509, 511 (1997). Failure to exhaust administrative remedies permits a court to dismiss an action for lack of subject matter jurisdiction. *Id*. This allows administrative agencies to exercise their jurisdiction without judicial interference until a final determination has been made. *Id*.; accord *Gundlah v. Pallito*, No. 2010-121, 2010 WL 7789283, at *1 (Vt. Dec. 8, 2010) (requiring exhaustion of inmate's request for kosher meals) (three-Justice opinion); *Martin v.*

*Hofmann*, No. 2007-181, 2008 WL 2815593, at *2 (Vt. Feb. 2008) (inmate's claim for reimbursement required exhaustion) (three-Justice opinion).

Mr. Bruyette never grieved and exhausted administrative remedies in relation to the issues he apparently is now trying to litigate in this case. He argues that his grievances should be treated as generally stating an objection to his Level C classification and that should be sufficient to encompass all these issues. Exhaustion is not a technicality, however. Mr. Bruyette's grievances never gave the DOC notice of his complaints and a fair chance to respond administratively.

*Conclusion*

The State's motion for summary judgment is granted on the grounds that Mr. Bruyette did not address through the administrative process, as he is required to do, the issues he seeks to have the court address in this lawsuit. It is unnecessary to address other issues, including those about which facts are disputed.

ORDER

For the foregoing reasons, the State's motion for summary judgment is granted.

Dated at Montpelier, Vermont this _____ day of February 2017.

_____
Mary Miles Teachout
Superior Judge

6